## DESPATCH OVEN COMPANY v. CLAYTON RAUENHORST AND ANOTHER.[1]

December 2, 1949.

No. 34,894.

---

[1]Reported in 40 N. W. (2d) 73.

*Lauerman & Pfeiffer,* for appellants.
*Freeman, King, Larson & Peterson,* for respondent.

PETERSON, JUSTICE.

Plaintiff sues to recover $4,185.50, the unpaid balance of the purchase price of a *seed*-corn "dryer" sold by it to defendants. Defendants asserted (a) a defense of no indebtedness based on allegations of breach of warranty as to the dryer's capacity and of damages resulting from a fire caused by alterations made in the dryer by plaintiff in an effort to make it conform to the warranty; and (b) a counterclaim for over $38,000 for breach of warranty and for negligence. The reply denied the breach of warranty and negligence, but admitted that defendants were entitled to an additional credit of $464. The trial court denied defendants' motion for a new trial and granted a motion by plaintiff for judgment notwithstanding the verdict as to the parts of defendants' counterclaim asserting a right of recovery for (a) loss of profits which would have been derived from the sale of seed corn if it had not germinated because of the lack of warranted capacity of the dryer; (b) for the value of the crib house used for drying feed corn and the contents thereof, which it was alleged were destroyed by fire caused by plaintiff's negligence; and (c) for loss of profits from the use of the crib house and dryer in conducting a *feed*-corn dryer business. The jury returned a verdict for defendants of $500. Thereafter defendants moved for a new trial, and plaintiff moved for judgment notwithstanding the verdict. Plaintiff's motion was granted, and defendants' was denied. Defendants appeal from the order denying their motion for new trial and from the judgment for plaintiff notwithstanding the verdict entered pursuant to the court's order.

The questions for decision are:

(1) Whether a clause providing that the seller "assumes no liability for consequential damages," following in the same paragraph of a sales contract containing express warranties of the goods sold another clause providing that the seller "shall not be liable" in certain other cases, means that the seller shall not be liable for consequential damages;

(2) Whether a buyer may recover for such damages for breach of contract of sale as arise directly in the usual course of things, where there is neither allegation nor proof thereof and the only allegations and proofs related to consequential damages, which were not recoverable under the terms of the contract; and

(3) Whether a party was negligent where the act complained of involved no danger of harm and he had no knowledge or notice that through the intervention of others it might be made so.

In August 1945, the parties entered into a written contract whereby plaintiff sold the "dryer" to defendants to be used for drying *seed* corn and warranted that it would do so under specified conditions. The purchase price was $4,356. While the apparatus is referred to as a "dryer," it really is a heater to heat air to be used in a crib house for the purpose of drying seed corn in bins therein. The dryer is a metal structure 20 feet long, 8 feet 6 inches wide, and 11 feet 6 inches high, in which there is at one end an oil burner and a combustion unit and at the other a fan operated by a 25-horsepower motor. In the burner-combustion unit, oil was burned, mixed with air, and combusted, and then forced toward the fan, which forced the heated-combusted mixture out of the dryer into ducts in the crib house, where it traveled to the bins to be used for drying seed corn therein.

The dryer was warranted by plaintiff to produce sufficient air having a temperature of 110 degrees Fahrenheit when the outside temperature was not less than 40 degrees Fahrenheit to dry during 24 hours 1,500 bushels of *seed* corn having not more than 26 percent moisture. The contract contained a provision:

"Contractor [plaintiff] *shall not be liable* for any losses, damage, detention or delays caused by fire, civil or military authority, in-

surrection, riot or any other causes beyond its reasonable control. Contractor *assumes no liability* for consequential damages of any kind which result from the use or misuse of the equipment supplied hereinunder by the Purchaser, his employees or others." (Italics supplied.)

The dryer was set so that it was in physical contact with the crib house. Defendants commenced using it about October 1, 1945, and continued seed-corn drying operations thereafter for about six weeks, or until about November 15. The seed corn which defendants dried contained from 30 to 40 percent moisture, which was much more than the 26 percent stipulated in the warranty. At first, there was some trouble with the oil burner in the combustion unit, consisting of its turning off when it was not supposed to do so. Plaintiff, through two of its employes, remedied this trouble by adjusting the air-control switch, by which the operation of the burner was controlled, and by installing a new oil pump. Defendant Clayton Rauenhorst testified that one of the employes inserted a piece of fiberboard in the air-control switch, with the consequence that the switch would not turn off automatically as it was intended that it should do. He also testified that except for lack of capacity the dryer "with the switch plugged" ran "perfectly proper." Because of the excessive amount of moisture in the seed corn to be dried and perhaps also because the air ducts in the crib house had some right-angle bends which interfered with the travel of the heated air, defendants were able to dry only about 300 bushels of seed corn in 24 hours. As a consequence, almost 3,400 bushels of seed corn, which if it had contained no more moisture than specified in the warranty and had been dried under the conditions therein specified could have been dried, germinated, causing defendants damage from loss of sales thereof in the sum of $16,910.

Shortly after the *seed*-corn operations were completed, defendants converted their plant into one for *feed*-corn drying. While *seed* corn must be dried at a temperature of not over 110 degrees Fahrenheit in order to preserve its germinating qualities, *feed* corn is dried at a temperature of from 180 to 200 degrees Fahrenheit. The conversion

necessitated an increase of production of heated air. For this purpose, defendants wanted to install a larger fan and a larger fan motor, and to increase the amount of combustion. Plaintiff increased the amount of combustion by cutting off about 30 inches of the combustion chamber and furnished a larger fan motor—a 40-horsepower motor to take the place of the 25-horsepower one originally supplied; but it refused to furnish a larger fan, for the reason that to do so would have been attended with danger of fire because of the special design of the dryer. By shortening the combustion unit, about 90 percent of the combustion took place outside the unit but immediately adjacent to it. The combusted mixture was forced toward the fan. Between the combustion unit and the fan there was a cone-shaped baffle plate attached to a screen extending across the interior of the dryer. The distance from the end of the combustion unit to the baffle plate was 5 feet 6 inches, and to the line of the fan about 11 feet 6 inches. The dryer was equipped with five safety controls which could be set to control the heat at the temperature desired for the particular drying operations, and which could be adjusted so as to increase the heat to 600 degrees. There was a so-called "high limit thermostat" located on the outside of the building which controlled the heat in the dryer even if the air-flow switch, which controlled the operation of the oil burner, was plugged and did not work. The high limit thermostat was set originally to control the heat in the dryer at 110 degrees Fahrenheit. It does not appear whether this temperature was changed when the dryer was converted for drying feed corn; but it does appear, however, that the defendants knew how to operate the thermostat and that it could be set so as to control the heat for feed-corn drying at the proper temperature, namely, 180 to 200 degrees Fahrenheit.

The crib house was destroyed by fire at about 4:30 on the morning of January 25, 1946. The larger fan motor supplied by plaintiff was destroyed by a fire which occurred a few days previously. The fan motor in use at the time of the fire was a secondhand one procured and installed by defendants without plaintiff's participation. Defendants' claim was that the fire was caused by excessive heat pro-

duced by the change made in the combustion unit and the larger fan motor which plaintiff supplied, even though the latter had been destroyed a few days previously and another motor substituted by defendants for it. The evidence showed that, when the dryer was operated to produce heat of a temperature of 110 degrees Fahrenheit under the conditions stated in the warranty, flames from the combustion unit extended only about three feet beyond the end thereof, and that any flame produced by the unit not only did not extend to the fan, but was stopped by the baffle plate. Consequently, no flame came nearer to the fan than six to eight feet. In addition, the evidence showed that in order to scorch or set fire to the crib house, which was in physical contact with the dryer, the outside metal shell of the latter would have to be heated to at least 400 degrees Fahrenheit. This is more than three and a half times the heat intended for drying *seed* corn and that at which the high limit thermostat was set by plaintiff, and about twice the heat intended for drying *feed* corn.

A further claim, to the effect that the dryer supplied by plaintiff had only one combustion unit whereas the contract called for one having two such units, was stressed by defendants. There was considerable argument as to whether the contract provided as defendants claimed it did, but there was neither allegation nor proof as to the value of such a dryer having two such units and of the one actually furnished having only a single unit, and as to the respect in which the alleged breach of contract contributed to the damage claimed by defendants.

From the arguments we understand that, in view of the fact that when the fire occurred defendants were using a larger fan motor of their own procurement and installation and not the one furnished by plaintiff, defendants now make no claim of negligence based on plaintiff's furnishing the larger fan motor, and base their claim of negligence solely on the cutting off of part of the combustion chamber by plaintiff.

In the final analysis, the contentions of the parties raise three questions, viz.: (1) Whether the clause in the contract that plain-

tiff "assumes no liability" for consequential damages exonerates it from such liability; (2) whether there is any basis for recovery by defendants for alleged breach of warranty in supplying a heater having only one combustion chamber instead of one having two such chambers; and (3) whether, aside from alleged breach of warranty, recovery by defendants against plaintiff was established upon the ground of negligence in cutting off of part of the combustion chamber.

■ Plaintiff contends that the damages claimed by defendants, whether caused by their "use or misuse" of the dryer, are "consequential" in nature, and that it is not liable therefor by reason of the clause that it "assumes no liability" for such damages. Defendants contend that the clause in question is not susceptible of such a construction, for the reason that the difference in language between that used in the first clause, to the effect that plaintiff "shall not be liable" on account of certain specified causes, as, for example, fire, acts of civil or military authority, insurrection, riot, or other causes beyond its reasonable control, and that used in the second clause relied on by plaintiff, to the effect that it "assumes no liability" for consequential damages, betokens a difference of meaning, and that to hold that the words "assumes no liability" in the second clause mean "shall not be liable" would entirely ignore and fail to give effect to the difference of meaning thus manifested. Defendants argue that under the circumstances the words "assumes no liability" mean not that plaintiff "shall not be liable," but rather "that it assumes no liability for such damages."

We have said many times that a contract should be so construed as to give effect to the intention of the parties as expressed in the language used, and that the words used are not only to be construed with reference to the subject matter of the contract and the circumstances of their use, but that they derive meaning from such factors. When parties enter into a contract they assume liabilities. As said in Skelly v. Bristol Sav. Bank, 63 Conn. 83, 87, 26 A. 474, 475, 38 A. S. R. 340, 19 L. R. A. 599:

"A contract is an agreement between parties whereby one of them acquires a right to an act by the other; and the other *assumes* an obligation to perform that act." (Italics supplied.)

Likewise, the purpose of a written contract is to define and limit the duties, obligations, and liabilities of the contracting parties flowing therefrom. See, 17 C. J. S., Contracts, § 1. Here, the parties, when they negotiated their contract, were engaged in the process of *assuming* and defining duties, obligations, and liabilities, and consequently the language in question is to be construed not only with reference to that process, but also with reference to the subject matter upon which it operated.

To begin with, the word "assume" etymologically means to take upon one's self, and when used in law with respect to a liability, as, for example, to *assume* a liability, it means to become personally liable therefor by paying or otherwise discharging it. Kirk v. Welch, 212 Minn. 300, 3 N. W. (2d) 426; Springer v. DeWolf, 194 Ill. 218, 62 N. E. 542, 88 A. S. R. 155, 56 L. R. A. 465; Texas Employers' Ins. Assn. v. Texas & P. Ry. Co. (Tex. Civ. App.) 129 S. W. (2d) 746; Lenz v. C. & N. W. Ry. Co. 111 Wis. 198, 86 N. W. 607. The use of the negative—assumes *no* liability—is indicative of an intention that the party shall *not* become liable.

The subject matter with respect to which the words "assumes no liability" were used embraces the extent of plaintiff's liability as a seller for damages for breach of warranty. The contract must be deemed to have been executed with reference to settled rules of law governing the subject matter. Propp v. Johnson, 211 Minn. 159, 300 N. W. 615; 2 Dunnell, Dig. & Supp. § 1818. Under well-settled rules, any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency thereof is to induce the buyer to purchase the goods and if he relies thereon in doing so. M. S. A. 512.12 (U. S. A. § 12[2]); Saunders v. Cowl, 201 Minn. 574, 277 N. W. 12. Absent contractual provisions to the contrary, there are in some cases certain implied warranties. §§ 512.13,

---

[2]Uniform Sales Act.

512.14, 512.15 (U. S. A. §§ 13, 14, 15) ; Federal M. T. Sales Corp. v. Shanus, 190 Minn. 5, 250 N. W. 713 ; Bekkevold v. Potts, 173 Minn. 87, 216 N. W. 790, 59 A. L. R. 1164; Moorhead v. Minneapolis Seed Co. 139 Minn. 11, 165 N. W. 484, L. R. A. 1918C, 391, Ann. Cas. 1918E, 481. The damages recoverable for breach of warranty are: (1) Such as arise naturally in the usual course of things from the breach itself; or (2) such as accrue as a *consequence* of the breach as the parties contemplated when making the contract. Frohreich v. Gammon, 28 Minn. 476, 11 N. W. 88. This is the rule of the famous case of Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Reprint 145, 5 Eng. Rul. Cas. 502, which we have adopted. Kolliner v. Western Union Tel. Co. 126 Minn. 122, 147 N. W. 961, 52 L.R.A.(N.S.) 1180; J. M. Paine & Co. v. Sherwood & Sewall, 19 Minn. 270 (315) ; 2 Dunnell, Dig. & Supp. § 2559, and cases cited in note 96. See, 15 Am. Jur., Damages, §§ 52, 53. The damages thus resulting as consequences are called "consequential damages." Francis v. Western Union Tel. Co. 58 Minn. 252, 59 N. W. 1078, 49 A. S. R. 507, 25 L. R. A. 406; Frohreich v. Gammon, *supra;* Beaupré v. Pacific & Atlantic Tel. Co. 21 Minn. 155; Bowas v. Pioneer Tow Line, 3 Fed. Cas. No. 1,713; Armstrong Rubber Co. Inc. v. Griffith (2 Cir.) 43 F. (2d) 689 ; Czarnikow-Rionda Co. v. Federal Sugar Ref. Co. 255 N. Y. 33, 173 N. E. 913, 88 A. L. R. 1426; 5 Williston, Contracts (Rev. ed.) § 1356; 3 Williston, Sales (Rev. ed.) §§ 614, 614a. A few examples will make clear what is meant. In Frohreich v. Gammon, *supra,* we held that the damages resulting in the usual course of things from a breach of warranty of a harvesting machine were the difference in value between the machine as warranted and the one delivered by the seller; that consequential damages (loss of crops caused by inability to harvest them because of breaches of warranty) were such as it might be reasonably supposed the parties contemplated would occur as a consequence of the breach, but not in the usual course of things; and that consequential damages were recoverable only where it appeared that the parties might reasonably be supposed to have contemplated them as a consequence of the breach. In Liljengren Furniture & Lbr. Co. v. Mead, 42 Minn. 420, 44 N. W.

306, we held, applying the rule, that the seller of sash and window and door frames was liable for breach of warranty for direct damages in the ordinary course of things consisting of the difference of their value as warranted and as they actually were, but that the seller was not liable for consequential damages consisting of loss of rents of the building in which they were to be installed caused by the breach, for the reason that it did not appear that such damages might reasonably be supposed to have been contemplated by the parties as a consequence of the breach.

The uniform sales act (§§ 512.69[6], 512.70 [U. S. A. §§ 69(6), 70]), in effect adopted the rule of Hadley v. Baxendale, supra. Berg v. Rapid Motor Vehicle Co. 78 N. J. L. 724, 75 A. 933.

The "consequential damages" referred to in the clause in question are such damages as to not arise directly according to the usual course of things from the breach of the contract itself, but are rather those which are the consequence of special circumstances known to or reasonably supposed to have been contemplated by the parties when the contract was made. Boylston Housing Corp. v. O'Toole, 321 Mass. 538, 74 N. E. (2d) 288, 172 A. L. R. 1251; Washington & O. D. Ry. v. Westinghouse Elec. & Mfg. Co. 120 Va. 620, 89 S. E. 131, 91 S. E. 646.

As applied here, the subject matter of the sales contract included not only a sale by plaintiff to defendants of the dryer for $4,356, but also plaintiff's liability as seller for both direct and consequential damages for breach of warranty thereof, the latter of which might exceed several times the purchase price and, as it turned out according to defendants' counterclaim for over $38,000, exceeded it over eight times. Plaintiff's liability as seller for damages for breach of warranty was one assumed as a consequence of warranties made in connection with the sale. It was prudent, therefore, to provide in the contract just what liability plaintiff as seller assumed with respect to the matter. The purpose of the paragraph containing the clauses that plaintiff as seller "shall not be liable" for certain liabilities and that it "assumes no liability for consequential damages" was to define and limit the liability assumed by plaintiff as seller.

See, Charles Lachman Co. Inc. v. Hercules Powder Co. Inc. (D. C.) 79 F. Supp. 206. Since, as has been pointed out, the ordinary meaning of the words "assumes no liability" is that a party who assumes no liability shall not be liable, the clause to the effect that plaintiff "assumes no liability for consequential damages" occurring from the use or misuse of the dryer, plainly means that it shall not be liable for consequential damages. The "consequential damages" include the loss of sales of both seed and feed corn occurring as a consequence of the alleged breaches of warranty. A clause in a sales contract providing that the seller shall not be liable for consequential damages for breach thereof exonerates the seller from liability for such damages. Monarch Brg. Co. v. George J. Meyer Mfg. Co. (9 Cir.) 130 F. (2d) 582; Boylston Housing Corp. v. O'Toole, *supra;* Wallich Ice Mach. Co. v. Hanewald, 275 Mich. 607, 267 N. W. 748; Associated Spinners, Inc. v. Massachusetts Textile Co. Inc. 75 N. Y. S. (2d) 263; Martin v. Southern E. & P. Co. (Tex. Civ. App.) 130 S. W. (2d) 1065; Washington & O. D. Ry. v. Westinghouse Elec. & Mfg. Co. *supra.* Hence, under the clause in question, plaintiff is not liable for any damages resulting from loss of sales of both seed and feed corn.

The rule that difference in language betokens difference in meaning is but a rule of construction, which has obvious limitations and which yields to manifestation of contrary intent. The rule does not apply where the language claimed to be different is in fact synonymous with the other language. Such is the case here. In both clauses it was provided, in effect, that plaintiff as seller should not be liable in the instances there mentioned.

The direct damages here are the difference between the dryer as warranted and as it actually was, but, as we shall presently show, these are not recoverable in this action.

■ Assuming, but without so deciding, that the contract called for two combustion chambers rather than one, which was furnished, and that consequently there was a breach of warranty for which defendants were entitled to recover, there can be no recovery here for such breach of warranty for more than nominal damages. In an

action for breach of warranty (the same rules apply to counterclaims, see 5 Dunnell, Dig. §§ 7598 to 7601), the complaint should set forth the warranty, the facts constituting the breach thereof, and the facts from which damages resulting from the breach are to be inferred. Segerstrom v. Swenson, 105 Minn. 115, 117 N. W. 478; Plano Mfg. Co. v. Richards, 86 Minn. 94, 90 N. W. 120; 5 Dunnell, Dig. § 8621. Here, there are no allegations of the direct damages, if any, sustained by defendants. Likewise, there was no proof of such damages. The only allegations and proofs with respect to damages relate to consequential damages, and these, as we have pointed out, are not recoverable. An appellate court will not reverse where the appellant is entitled to recover nominal damages and nothing more. Hardware Mut. Cas. Co. v. Fligelman, 208 Minn. 354, 294 N. W. 213; 1 Dunnell, Dig. & Supp. § 417a; cf. Sallblad v. Burman, 225 Minn. 104, 29 N. W. (2d) 673. In Sloggy v. Crescent Creamery Co. 72 Minn. 316, 75 N. W. 225, we applied the rule in affirming where the buyer was entitled to recover only nominal damages for breach of warranty. There are certain cases where the appellate court will reverse in favor of an appellant entitled to recover only nominal damages, but only where the right asserted is such that it can be vindicated only by recovery of such damages or some sort of relief ancillary thereto. See, Whittaker v. Stangvick, 100 Minn. 386, 111 N. W. 295, 117 A. S. R. 703, 10 L.R.A.(N.S.) 921, 10 Ann. Cas. 528. This is not such a case. Since there is no basis for the recovery by defendants of direct damages for the alleged breach of warranty in question, the breach, if there was one, and the failure to grant any relief therefor are no obstacles to an affirmance.

■ Defendants contend that, aside from any liability for breach of warranty, plaintiff is liable for negligence consisting of its cutting off part of the combustion chamber in the manner above described. It is axiomatic that an act or omission is not negligent unless the actor has knowledge or notice that it involves danger to others. Duty to exercise care is dictated and measured by the exigencies of the occasion as they are or should be known to the actor; and if no harm should be anticipated as a consequence of the act there is no

negligence. Rue v. Wendland, 226 Minn. 449, 33 N. W. (2d) 593; 4 Dunnell, Dig. & Supp. §§ 6970, 6972. As said in Christianson v. C. St. P. M. & O. Ry. Co. 67 Minn. 94, 97, 69 N. W. 640, 641:

"* * * If a person had no reasonable ground to anticipate that a particular act would or might result in any injury to anybody, then, of course, the act would not be negligent at all; * * *."

As a corollary, it follows that ordinary care does not involve forethought of extraordinary peril. Greenwald v. Northern States Power Co. 226 Minn. 216, 32 N. W. (2d) 320. As applied here, there was no harm from cutting off the combustion chamber to be apprehended by plaintiff. The chamber was designed to dry seed corn at a temperature of 110 degrees Fahrenheit. When converted into a feed-corn dryer, it was anticipated that the temperature would be from 180 to 200 degrees Fahrenheit. Since the flames from the combustion chamber when the dryer was operated for its intended purposes did not come in contact with the fan or crib house, but were at least six or eight feet distant therefrom, and, on top of that, were obstructed by the baffle plate, there was no danger of fire by direct contact of the flames with the crib house. Harm to the crib house by fire or scorching could result only if the temperature was increased to over 400 degrees Fahrenheit. Plaintiff had no reason to anticipate flames long enough to set fire to the crib house or a temperature in the dryer high enough to ignite it. The known uses of the dryer contemplated maximum temperature of between 110 degrees for seed corn and 180 to 200 degrees for feed corn, which was well within the range of safety. Besides, the high limit thermostat was set to control the temperature at 110 degrees Fahrenheit and would have controlled the heat at that temperature or at any other at which it might be set, even if the air control in the oil burner was not functioning. When the dryer was used for drying feed corn, a temperature of from 180 to 200 degrees Fahrenheit was required, but plaintiff had no reason to believe that defendants would increase the heat to at least twice that mentioned. Only some acts by defendants or their employes evincing an extreme disregard of safety, in which

plaintiff took no part, which it could not reasonably be held to have anticipated and for which it is not responsible, caused the temperature in the dryer to be increased to the point where it caused the crib house to burn. Such extraordinary negligence on the part of others was not to be anticipated by plaintiff. Hence, there can be no recovery for negligence.

In conclusion, we think that defendants are not entitled to recover either for breach of warranty or for negligence, and that there should be an affirmance.

Affirmed.