**LAFAYETTE STABILIZER REPAIR, INC., Plaintiff-Appellee,**

v.

**MACHINERY WHOLESALERS CORPORATION, Defendant-Appellant.**

**No. 83–4416.**

United States Court of Appeals, Fifth Circuit.

Jan. 21, 1985.

---

Howard F. Ullman, Michael W. Ullman, North Miami Beach, Fla., Arthur J. England, Jr., Miami, Fla., for defendant-appellant.

Constance A. Koury, Koury & Koury, Joseph A. Koury, Lafayette, La., John K. Grubb, Houston, Tex., for plaintiff-appellee.

Before GARWOOD, THORNBERRY, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

This case was analyzed under Louisiana law by the district court which then awarded the plaintiff a refund of the purchase price of a defective lathe. Finding that the contract of sale for the lathe provided for the application of Florida law but that plaintiff would nevertheless prevail under Florida law, we affirm.

## FACTS

This is a diversity action between Lafayette Stabilizer Repair, Inc., a Louisiana corporation, and Machinery Wholesalers' Corp., a Florida corporation. Lafayette sued in Louisiana state court for redhibition and damages, requesting $69,000 as a return of the purchase price of an allegedly defective lathe from Machinery Wholesalers and $223,500 in damages, as well as attorneys' fees.[1]

The case was removed to federal court upon petition by Machinery Wholesalers.

While considering the purchase of a hollow spindle lathe from Machinery Wholesalers, Lafayette sent two representatives, Roy Trimble and Neal Comeaux, to inspect the lathe in Houston, Texas. Comeaux, a machinist, observed the lathe in operation, while it was set up "on turning OD's," but did not ask the person demonstrating the machine's operation to show it cutting API connections after being told that "it would cut good API connections."

Lafayette and Machinery Wholesalers signed a purchase agreement for the lathe on April 28, 1981, through their respective agents, Joseph Koury and Monet Sevier. On page 1 of the agreement the lathe was described, its purchase price of $69,000 was specified, and it was noted that a deposit of $500 was acknowledged to have been made to hold the machine. The purchase agreement included the following handwritten paragraph on page 2:

> Above machine guaranteed to be in sound operating condition. An allowance of $6900 will be available for any neces-

---

1. The relevant Louisiana redhibitory provisions are the following:

    *Redhibition* is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.

    La.Civ.Code Ann. art. 2520 (West 1952).

    Apparent defects, that is, such as the buyer might have discovered by simple inspection, are not among the number of redhibitory vices.

    *Id.* art. 2521 (West 1952).

    The seller who knew not the vices of the thing, is only bound to restore the price, and to reimburse the expenses occasioned by the sale, as well as those incurred for the preservation of the thing, unless the fruits, which the purchaser has drawn from it, be sufficient to satisfy those expenses.

    *Id.* art. 2531 (West 1952).

    The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of the price and repayment of the expenses, is answerable to the buyer in damages.

    *Id.* art. 2545 (West 1952).

sary repairs to put same in above-stated condition. Payment for these repairs if needed will be only within 30 days of receipt of valid invoices.

A number of printed provisions were on the back of each page of the signed agreement, one of them being the provision in dispute in this case which states:

FLORIDA LAW GOVERNS. The parties acknowledge that this Contract was entered into in Florida and that Florida law shall govern the terms thereof.

The agreement was mailed to Machinery Wholesalers' home office in Miami, Florida, where it was approved.

After the lathe was delivered to Lafayette, it was immediately discovered that the lathe could not cut the API connections that were necessary for the work done by Lafayette. Neal Comeaux explained the problem as follows: "the connection itself is threads, and it was jumping from one side of the thread to the next, on the other thread. It was not forming a perfect thread." Repairs were made to the lathe, but by September Lafayette was informed that the machine would have to be rebuilt. On October 23, 1981, Lafayette wrote Machinery Wholesalers asking them to accept the return of the lathe. Machinery Wholesalers declined to do so.

The trial court determined that the Florida law provision was not binding, and since Louisiana had the most significant relationship to the sale, that Louisiana law governed the rights and liabilities of the parties. The court also made the following findings and conclusions: (1) that the lathe was not in good operating condition at the time of the sale, being incapable of properly cutting API connections; (2) that Lafayette purchased the lathe specifically for the purpose of using it to cut API connections and would not have made the purchase had it known of the defect; (3) that the condition of the lathe was not apparent upon ordinary inspection; (4) that Lafayette notified Machinery Wholesalers of the existence of the defects on more than one occasion before requesting on October 23, 1981, that they accept the return of the lathe; and (5) that the $6900 provision for

repairs was not a waiver of redhibitory rights.

The court permitted a rescission of the sale. Lafayette was to recover the purchase price of the lathe and certain associated expenses such as the interest paid on the loan to finance the purchase of the lathe and the cost of repairs to the lathe paid for by Lafayette. Lafayette recovered a total of $86,436.55. Lafayette was not granted the relief it sought as to its claims for lost profits and attorneys' fees.

## ANALYSIS

### (1) Applicable Law

■ The trial judge found that the contract provision that Florida law would apply was not binding on Lafayette because "[n]othing on the front of the document directed Koury's attention to the provisions on the reverse side and no one called his attention to them." We conclude that this finding is clearly erroneous for the following reasons. *See* Fed.R.Civ.P. 52(a).

■ The paper on which the contract was executed was sufficiently transparent to enable anyone examining it to observe that printed provisions appeared on the back of the contract. Koury, who signed the contract, was a lawyer with approximately twenty-seven years of experience, and, thus, could reasonably be expected to examine the back of even an opaque contract for additional provisions. Most certainly he would have examined the backside of one whose transparent characteristic evinced printed provisions thereon. Sevier, who signed the contract on behalf of Machinery Wholesalers, testified that he told Koury that Florida law would govern the transaction. Trimble, an employee of Lafayette who was also involved in the transaction, testified that he personally observed Koury looking at both the front and back of the agreement before signing it. Despite Koury's own testimony denying any awareness of the Florida law provision, the evidence is persuasive without doubt that he was aware of the provision, and that he did sign the agreement containing the provision.

Under Florida law

> [i]t is well established that when the parties to a contract have indicated their intentions as to the law which is to govern, it will be governed by such law in accordance with the intent of the parties .... *The language used in the contract is the best evidence of the intent of the parties* at the time they entered into the contract.

*Dep't of Motor Vehicles v. Mercedes-Benz of North America, Inc.*, 408 So.2d 627, 629 (Fla.App.1981) (citation omitted) (emphasis added); *accord Hirsch v. Hirsch*, 309 So.2d 47, 49–50 (Fla.App.1975).

■ However, under Louisiana law, a provision concerning the governing law may not be enforced if the law chosen does not have a significant relationship to the contract. *See Davis v. Humble Oil & Refining Co.*, 283 So.2d 783, 788 (La.App. 1973). *Davis* may be distinguished in that it involved an adhesion contract. Even if *Davis* otherwise applies, Florida does have a significant relationship to the contract. The contract was approved in the Miami, Florida, home office of Machinery Wholesalers. Thus, Florida law should have been applied by the Louisiana court in accordance with the intent of the parties.

The decision need not be reversed, however, if there is no showing that a different result would have followed under Florida than under Louisiana law (even if the law itself differs). *See Davis v. Stern*, 348 So.2d 726, 727 (La.App.1977).

Three areas have been raised by Machinery Wholesalers as pointing to a different result under Florida law: (1) lack of proper notice of any breach of warranty; (2) the effect of the inspection in negating any claim for breach of implied warranty; and (3) liquidated damages of $6900 as a contract provision.

### (2) Notice of Breach

■ Florida law provides that

> [w]here a tender has been accepted: (a) The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy ....

Fla.Stat. § 672.607. The district court specifically found that Lafayette notified Machinery Wholesalers on more than one occasion that the lathe was not working, *i.e.*, not cutting the API connections, despite efforts to repair it. This finding may be construed as providing adequate notice under Florida law. Under Florida law, the notice must be "both sufficient and timely." *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 973 (5th Cir.1976). The determination of whether the notice complies with the legal requirements "typically depend[s] upon the reasonableness of the buyer's efforts to communicate his dissatisfaction." *Id.* "The question of reasonableness must be determined from the circumstances in the individual case." *Id.* (citing *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 298 (3d Cir.1961)). While Machinery Wholesalers contends that no adequate notice was received until six months after the sale, the facts show that the problems with the lathe were continuing and that the repeated efforts to repair it were unsuccessful, with Lafayette eventually being told that the machine needed rebuilding. That Lafayette was patient in trying to have the machine repaired does not render its eventual notification requesting a refund of the purchase price inadequate or untimely when the circumstances as a whole are considered.

### (3) Inspection

The relevant provision in Florida law concerning inspection is that

> "[w]hen the buyer before entering into the contract has examined the goods ... as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him...."

Fla.Stat. § 672.316(3)(b). The trial judge found that the defect was not discoverable upon simple inspection. Lafayette relies on this finding. Machinery Wholesalers asserts that since the machine was being purchased specifically to perform stabilizer repair work, the inspection should have included a test of the lathe's ability to cut

what it was being purchased to cut, *i.e.,* API connections.

 While a more complete inspection of the lathe might have uncovered its hidden defect—of being unable to cut API connections—the overall problem with the machine was even more severe: it was worn out to the point of not being readily repairable. The issue is whether the defect for which Lafayette seeks a remedy was discoverable by customer inspection at the time of sale. The district court's finding that the condition of the lathe "was not apparent upon ordinary inspection" is not clearly erroneous.[2]

### (4) Liquidated Damages

 Machinery Wholesalers also asserts that the $6900 ceiling for repairs handwritten into the agreement constituted liquidated damages under Florida law. The applicable statutory provision provides that

> [d]amages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.

Fla.Stat. § 672.2–718. First, Florida law does allow contracts to limit damages recoverable for breach of warranty and breach of contracts, and if such provisions have been made, greater compensatory damages may not be awarded. *See id.; Hi Neighbor Enterprises, Inc. v. Burroughs Corp.,* 492 F.Supp. 823, 827 (N.D.Fla.1980). In *Burroughs,* there was a provision in the contract designated as "limitation of liability" which specified in part that Burroughs would not "be liable for loss of profits, indirect, incidental, special, consequential, or other similar damages arising out of any breach of this agreement..." *Id.* at 827.

 In the present case, the provision in question, by its own language, sets a liability limit to repairs. However, the real question is whether the $6900 provision for repairs, by its language, 9 prohibits the damages awarded in conjunction with the rescission. The provision is not properly construed as preventing a refund of the purchase price. Thus Lafayette did not limit its liability to $6,900 if the express warranty about the lathe's cutting ability was not fulfilled. The $6900 amount, 10% of the purchase price, is not a reasonable amount for damages if, as in this case, the machine cannot be repaired after several attempts and does not work.

### CONCLUSION

 The application of Florida law to the case would not alter the outcome reached below. Therefore no reversible error was committed. *See Davis v. Stern,* 348 So.2d at 727.

AFFIRMED.

---

**2.** The court made its finding pursuant to a similar legal requirement under Louisiana law. *See*

La.Civ.Code Ann. art. 2520 *supra* note 1.