**NORTHERN STATES POWER COMPANY, Appellee,**

v.

**ITT MEYER INDUSTRIES, a DIVISION OF ITT GRINNELL CORPORATION, Appellant.**

Nos. 84–5176, 84–5177.

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1985.

Decided Nov. 14, 1985.

Jack M. Fribley, Minneapolis, Minn., for appellant.

John L. Devney, St. Paul, Minn., for appellee.

Before ARNOLD and JOHN R. GIBSON, Circuit Judges, and PHILLIPS,[*] Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

ITT Meyer Industries, a division of ITT Grinnell Corporation, appeals from a judgment in favor of Northern States Power Company on its breach of warranty claim. Meyer had contracted to manufacture screw anchors for NSP. These anchors were intended to support towers carrying an electric transmission line. After several of the anchors broke, causing five towers to collapse within four days, both Meyer and NSP investigated the cause of the failures. NSP did not formally notify Meyer of its claim for breach of warranty until approximately five months later. In the interim, NSP replaced all of the anchors. NSP then brought this action invoking diversity jurisdiction. On appeal Meyer claims that the notice was not timely as a matter of law and additionally contends that the district court erred in reading technical specifications in the contract as creating an additional express warranty not affected by the disclaimers in the contract. NSP cross-appeals, arguing primarily that the district court erred in ruling that the cost of removing the defective anchors and reinstalling modified anchors was a consequential damage subject to reduction for comparative fault. We affirm the judgment of the district court[1] in all respects.

NSP was constructing a transmission line from northeast of the Twin Cities to the Canadian border, building it in stages, and utilizing towers supported by guy wires which were attached to buried screw anchors. After some dissatisfaction with the products of other manufacturers, NSP discussed with Meyer personnel the possibility of Meyer's fabricating the screw anchors. NSP was aware that Meyer had never before manufactured screw anchors and that its engineer, Robert Fiss, had never before designed a screw anchor. Fiss submitted an original design for review by NSP project engineers and consultants who suggested modifications including reducing the number of bolts. Fiss revised his design, replacing the bolted connector with a welded extension. The anchors were subjected to laboratory tests devised by NSP. The anchors passed these tests.

After further meetings, NSP issued a request for quotation for anchors meeting detailed performance specifications sup-

---

[*] The HONORABLE HARRY PHILLIPS, Senior Circuit Judge for the Sixth Circuit, sitting by designation. Judge Phillips participated in oral argument and at conference agreed with the vote of the panel. However, due to his untimely death he did not have an opportunity to review this opinion.

1. The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

plied by NSP. Meyer returned a lengthy proposal containing, among other provisions, a warranty clause and a limitation of liability clause. NSP awarded the contract to Meyer and sent Meyer a written purchase order. Meyer then returned a written sales acknowledgment which incorporated its proposal. Thereafter, NSP field tested the anchors and suggested further design changes, including the addition of a second weld to each of the four helices on the anchors' lead sections. These were incorporated into the anchors upon manufacture.

NSP quality assurance inspectors and separately hired inspectors from Twin City Testing inspected the production process. Between February and March 1979, under NSP supervision, approximately 1,080 Meyer screw anchors had been satisfactorily installed. Approximately twenty anchors broke on installation, a failure rate acceptable to NSP. By September 30, 1979 approximately fifty towers were in place with tensioned guy wires. Between September 27 and September 30, 1979 four towers, located within a span of thirteen adjacent towers, fell to the ground after being plumbed and tensioned. In each case an anchor extension had separated from its coupling at the coupling weld. A fifth tower collapsed shortly thereafter.

NSP immediately informed Meyer of the collapses and Fiss, the designer of the anchors, went to the sites to analyze the problem. On or about October 4 Meyer and NSP personnel met to discuss the anchor failures. The decision was made that they would work jointly to determine the cause of the failures and the action to take in response. By October 5 an NSP metallurgist and Meyer's vice president and technical director discussed the problem with Twin City Testing which was retained to determine the cause of the failures. In addition, Meyer retained a University of Minnesota metallurgist to determine the cause of the failures. He ultimately became Meyer's principal expert at the trial.

After the tower collapses, NSP reduced the tension on the remaining towers and began retesting the anchor installations. This resulted in additional anchor failures. Twin City Testing determined that the anchor failures were caused by "poor joint design" of the welded coupling, and "deficiencies in the weld procedure." Twin City Testing reported its results to both NSP and Meyer. On October 10 NSP decided to remove all of the anchors and extensions. It decided to cut off the welded couplings on the extensions and rework the couplings to provide for an all bolted connection. NSP contracted with Meyer and with Empire Bucket Company to assist in the removal and replacement process. During the removal process an additional thirteen anchor failures occurred.

On October 15, 1979 NSP told Meyer of its plan to remove and modify all the extensions. A few days later Meyer completed its own investigation and concluded that it was not in any way responsible for the anchor failures. It did not inform NSP of this conclusion, but in an internal memoranda Meyers stated that it was aware that there would be considerable discussion of the liabilities resulting from the failures. Meyer felt NSP had wrongly decided to remove the anchors and extensions but did not tell NSP of its disagreement or suggest any other remedial action.

On February 28, 1980 NSP wrote Meyer that it had breached the parties' contract by supplying defective anchors. Meyer rejected NSP's claim. This lawsuit ensued. NSP sought recovery of nearly $2 million for costs incurred in repair, modification, and replacement of the extensions, as well as for reinstalling and reattaching the reworked anchors.

The case was tried to a jury for nearly four weeks. The jury answered twenty-four specific interrogatories. It found Meyer liable in negligence for breach of warranty and for damage to the fallen towers. The jury concluded that the breach of warranty also contributed to the need to rework all of the Meyer anchors, and that Meyer was responsible for a portion of NSP's damages for the rework. The jury found NSP fifteen percent at fault for the

defective condition of the anchors and forty-five percent at fault for other consequential property damages. The district court then decided, as a matter of law, that the limitation of liability clause in the contract was inherently inconsistent with the express warranties created by the performance specifications and thus did not bar recovery of damages by NSP. The court entered judgment for NSP in the amount of $843,848.59 for 85% of the damage to the fallen towers, Meyer's share of the cost of reworking the anchors, and the portion of Meyer's fault for other property damage submitted to the jury as consequential damages. A motion for judgment notwithstanding the verdict was considered and denied.

Meyer argues on appeal that NSP's notice of breach of warranty was untimely as a matter of law. Meyer also argues that the contractual limitation of liability is a complete defense to NSP's claims.

### I.

In answer to a special interrogatory, the jury found that NSP gave Meyer timely notice of the breach of warranty. Meyer urges this court to reject this finding and conclude, as a matter of law, that NSP failed to give timely notice of breach. Meyer stresses that NSP made a unilateral decision to remove and replace all the screw anchors before it notified Meyer of a claimed breach of warranty. It also emphasizes that NSP hired Meyer, and paid it without protest, to aid in the replacement process. Meyer relies on *K & M Joint*

*Venture v. Smith International, Inc.*, 669 F.2d 1106 (6th Cir.1982), in which the court held that the buyer's conduct in engaging and paying for the seller's repair and replacement services without protest was inconsistent with the claim that the buyer considered the seller to be in breach of warranty. *Id.* at 1114.

Where more than one inference may be drawn from undisputed facts, or where the facts are disputed, the sufficiency of notice of a breach of warranty is a question properly submitted to the jury. *Rowe International, Inc. v. J–B Enterprises Inc.*, 647 F.2d 830, 833 (8th Cir.1981); *Wilson v. Marquette*, 630 F.2d 575, 584 (8th Cir.1980); *Standard Alliance Inc. v. Black Clawson Co.*, 587 F.2d 813, 823 (6th Cir.1978). We may not disturb the jury's verdict if there is substantial evidence in the record which fairly tends to support that verdict. *Worthen Bank & Trust Co. v. Utley*, 748 F.2d 1269, 1273 (8th Cir.1984); *Mizell v. United States*, 663 F.2d 772, 776 (8th Cir. 1981).

The Uniform Commercial Code as adopted by Minnesota states that where tender has been accepted, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Minn.Stat. § 336.2–607(3)(a) (1965).[2] We have held that the notice which satisfies this section need only be such that informs the seller that the transaction is troublesome and needs to be watched.[3] *Lewis v. Mobil Oil Corp.*, 438

---

**2.** Minnesota adopted section 2–607(3) of the Uniform Commercial Code, without modification. The Code provision is substantially similar to the statutory language which it replaced. Compare Minn.Stat. § 336.2–607, and comment 2–607(3)(a) with Minn.Stat. 512.49. While there is no Minnesota court decision construing the adequacy of notice under the present section, decisions under the predecessor statute are consistent with this notice standard. *See Moosbrugger v. McGraw-Edison Co.*, 284 Minn. 143, 156, 170 N.W.2d 72, 80 (1969) (buyer's letter to seller expressing disatisfaction with machine's operation and recurring needs for maintenance constitutes adequate notice of breach even though buyer made no specific claim for damages).

**3.** This language is taken from Minn.Stat. § 336.-2–607(3)(a) comment 4 (1965), which reads in part:

The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2–604). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the

F.2d 500 (8th Cir.1971); *see also Speakman Co. v. Harper Buffing Machine Co., Inc.*, 583 F.Supp. 273 (D.Del.1984); *Royal Typewriter Company v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1102 (11th Cir.1983); *Alafoss v. Premium Corporation of America*, 599 F.2d 232, 235 n. 5 (8th Cir.1979).

In *Mobil Oil* a sawmill operator, Lewis, claimed that Mobil breached warranties of fitness for a particular purpose when it supplied the wrong oil for use in a hydraulic pump. Lewis experienced problems with the pump for approximately two and one-half years after he began using the Mobil oil. The parties ultimately traced the source of the problem to the oil after which Lewis interposed his breach of warranty claim. We rejected Mobil's argument that Lewis failed to give timely notice of the breach. We observed that early in the relationship Lewis indicated his concern that the oil may have been the source of the problem. In addition, we noted that the parties maintained close contact throughout this period as they attempted to solve the problems. We concluded from

this that there was sufficient notice to satisfy section 2–607(3).

Two policies underlie the notice requirements of section 2–607(3)(a). The first is to enable the seller to make adjustments or replacements or to suggest opportunities for cure. The second is to afford the seller a fair opportunity to investigate and prepare for litigation. J. White & R. Summers, *Uniform Commercial Code* 344–45 (1972); *see also Southern Illinois Stone Company v. Universal Engineering Corp.*, 592 F.2d 446, 452 (8th Cir.1979) (parties working together for several months provided the kind of notice which opens the way for normal settlement through negotiation and therefore satisfied section 2–607(3)); *Eastern Airlines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d at 976 (notice must open way for settlement through negotiation and be offered in good faith). Comment 4 to Code section 2–607 summarizes the overall thrust of the notice requirement as "designed to defeat commercial bad faith." Minn.Stat. § 336.2–607(3)(a) comment 4 (1965). A number of courts have stated that the adequacy of notice of breach of warranty must be eval-

buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

Courts do not agree on what constitutes adequate notice to satisfy section 2–607(3). A number of courts refuse to endorse the first sentence of comment 4 as an appropriate articulation of the standard. These courts focus instead on the last sentence of comment 4 as authorizing a stricter standard by which to evaluate section 2–607(3) notice. *See e.g., K & M Joint Venture v. Smith International, Inc.*, 669 F.2d 1106, 1113 (6th Cir.1982); *Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338, 359–60 (5th Cir. 1980); *Eastern Airlines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 976 (5th Cir.1976).

It is highly doubtful that the drafters of comment 4 intended to articulate conflicting standards by which to evaluate the adequacy of notice under section 2–607(3). Therefore, the comment should be construed, if possible, to advocate a consistent guideline. A majority of the courts recognize as harmonizing factors the policies which underlie the section 2–607(3) notice requirement. *See, e.g., Eastern Airlines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d at 976 (code dispenses with rigid notice requirement

which may deny an uninformed consumer of an otherwise valid claim); *Speakman Co. v. Harper Buffing Machine Co., Inc.*, 583 F.Supp. 273 (D.Del.1984) (quality of notice need not achieve perfection so long as it satisfies the policies underlying the code provision). These courts agree that the adequacy of notice must be determined on a case by case analysis with attention to whether the buyer acted with commercial good faith. *See Eastern Airlines*, 532 F.2d at 976 (a buyer's conduct under [section 2–607(3)(a)] must satisfy the Code's standard of commercial good faith); *LaFayette Stabilizer Repair, Inc. v. Machinery Wholesale Corp.*, 750 F.2d 1290, 1294 (5th Cir.1985) (determination of whether notice complies with the legal requirement depends upon the reasonableness of the buyer's efforts to communicate dissatisfaction) (citations omitted); *Kopper Glo Fuel, Inc. v. Island Lake Coal Co.*, 436 F.Supp. 91, 96 (E.D.Tenn.1977) (notice analysis must be conducted with attention overall to questions of commercial good faith).

Read in light of the above principles, the differences between the courts may be more apparent than real. *But see, K & M Joint Venture v. Smith Int'l.*, 669 F.2d at 1111–14 (portions of the court's opinion seem to advocate formal claim of breach to officers in seller's organization to satisfy section 2–607(3)(a)).

uated from the perspective of the policies underlying the notice provision. *See, e.g. Stevenson & Co., Inc.*, 629 F.2d at 361. While we have not expressly stated this rule, our analyses in previous cases manifest a similar analytical approach. Thus, in *Mobil Oil* we assessed the buyer's level of good faith in determining whether the seller received reasonable notice. *Lewis v. Mobil Oil Corp.*, 438 F.2d at 509. *See also, Boeing Airplane Company v. O'Malley*, 329 F.2d 585, 593–96 (8th Cir.1964) (after analyzing buyer's expressions of dissatisfaction court determined that seller could not have been surprised by formal notice of lawsuit and therefore that notice was adequate).

■ Applying these concepts to this case, we conclude that NSP's notice to Meyer was not inadequate as a matter of law. NSP promptly notified Meyer of the tower failures. Meyer was called to the scene and participated in the review of the problem. It was privy to the consultant's report which attributed the failures to defective materials and workmanship. In addition, it had an opportunity to hire its own expert to examine the failed anchors and act as its principal expert at trial. Finally, in an in-house memo to its personnel, Meyer acknowledged that it expected "considerable discussion about the liabilities involved."[4] We conclude that this constitutes sufficient evidence from which a jury could find that Meyer received reasonable notice that NSP claimed a breach of warranty.

The Sixth Circuit's decision in *K & M Joint Venture* does not require a contrary result. In *K & M Joint Venture* the court of appeals was asked to determine whether the district court applied the correct legal standard to its review of the facts in that case. *Id.* at 1112. Thus, the court was not engaged, as we are, in review of a jury's factual findings. In *K & M Joint Venture* the court determined that the district court applied the wrong law to the facts and substituted on review a stricter standard of analysis.[5] The court did not conclude that a buyer's retention of the seller to provide repair and replacement services, and paying for these services without protest, precluded, as a matter of law, a finding that the buyer gave adequate notice of breach. Rather, the court found that in that case the buyer's conduct, as a whole, did not satisfy the section 2–607(3)(a) notice requirement. *Id.* at 1115.

Meyer has not challenged the legal standard on which the district court submitted this case to the jury. We therefore confine our review to the sufficiency of the evidence to support the jury's factual findings. We conclude, consistent with our opinions in *Mobil Oil* and *Boeing Airplane Co.*, that there is substantial evidence in the record to support the jury's finding that NSP gave Meyer adequate and timely notice of its claimed breach of warranty.

## II.

Meyer argues that the four warranties contained in Item 16 of the terms and conditions of sale[6] constitute the only warran-

4. Plaintiff's exhibit No. 1477.

5. In a footnote to its opinion, the court further noted that even if the district court's findings were purely factual they would be reversed as "clearly erroneous". *K & M Joint Venture*, 669 F.2d at 1112 n. 1. This conclusion is derived from the court's determination that the adequacy of the notice given was to be judged by a stricter legal standard than that applied by the district court. *Id.* at 1114.

6. Item 16 of the Terms and Conditions of Sale provides:

> Meyer warrants for one (1) year that all Products (a) are designed in accordance with generally accepted engineering practice, (b) will

withstand destruction test loads to the extent of the calculated loads of yield stress the Products are designed to withstand, (c) will be fabricated in accordance with drawings furnished by Meyer and approved by the Buyer, and (d) are free from defects in materials and workmanship.

Meyer's liability for any breach of this warranty shall be limited solely to job site replacement or repair, at the sole option of Meyer, of any defective part or parts, during a period of one (1) year from the date of shipment, providing the Product is properly installed and is being used as originally intended.

IT IS EXPRESSLY AGREED THAT THIS SHALL BE THE SOLE AND EXCLUSIVE

ties made in its transaction with NSP. Meyer maintains that Item 16 effectively disclaims all other warranties and liabilities and limits the remedy for breach of the warranties made to repair or replacement at Meyer's sole option. Thus, Meyer contends, Item 16 of the contract governs NSP's breach of warranty claims.

### A.

The court submitted to the jury the question whether any express warranties arose from the performance specifications. The jury answered this question affirmatively.[7] The district court then denied Meyer's motion for a judgment notwithstanding the verdict on the issue of whether a separate warranty was created. *Northern States Power Co. v. ITT Meyer Industries,* Civ. No. 4–80–280, Mem. op. at 4–6 (D.Minn. June 21, 1984).

Whether an express warranty arises from the language and circumstances of a transaction is a question properly submitted to the jury. *See, e.g., Heil v. Standard Chemical Manufacturing Co.,* 301 Minn. 315, 322, 223 N.W.2d 37, 41 (1974). This court will not disturb the jury's verdict unless, as a matter of law, the evidence fails to establish the existence of an express warranty.

Under Minnesota law an express warranty may arise from an affirmation of fact or promise or a description of the goods made by the seller to the buyer which becomes part of the basis of the bargain. Minn. Stat. § 336.2–313 (1965).[8] A description may consist of technical specifications. *See Id.* § 336.2–313, Comment 5 (1965).

Here, NSP's request for a quotation for the anchor project contained detailed technical specifications for the screw anchors. Meyer's bid proposal, which ultimately was accepted, stated in part that "the material we propose to supply meets the design requirements as specified including the impact property requirements as specified."[9] Further, in its formal acknowledgment of the transaction, Meyer expressly incorporated the terms of the above proposal into the contract.

■ On this record we cannot conclude as a matter of law that the warranties in Item 16 were the sole express warranties created. We believe that the jury could

---

REMEDY OF THE BUYER. UNDER NO CIRCUMSTANCES SHALL MEYER BE LIABLE FOR ANY COSTS, LOSS, EXPENSE, DAMAGES, SPECIAL DAMAGES, INCIDENTAL DAMAGES OR CONSEQUENTIAL DAMAGES ARISING DIRECTLY OR INDIRECTLY FROM THE USE OF THE PRODUCTS, WHETHER BASED UPON WARRANTY, CONTRACT NEGLIGENCE OR STRICT LIABILITY.
THE WARRANTY AND LIMITS OF LIABILITY CONTAINED HEREIN ARE IN LIEU OF ALL OTHER WARRANTIES AND LIABILITIES, EXPRESSED OR IMPLIED. ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE HEREBY DISCLAIMED BY MEYER AND EXCLUDED FROM THIS WARRANTY. FURTHER MEYER DOES NOT WARRANT THAT THIS PRODUCT COMPLIES WITH LOCAL, MUNICIPAL, STATE OR FEDERAL CODES, IF ANY. THE BUYER ALONE IS RESPONSIBLE FOR KNOWLEDGE OF AND COMPLIANCE WITH ANY SUCH CODES.
Meyer neither assumes nor authorizes any person to assume for it, any other obligation in connection with the sale of the Product. This warranty shall not apply to any Product or parts of Product which (a) have been repaired or altered outside of Meyer's facilities; or (b) have been subjected to misuse, negligence or accident; or (c) have been used in a manner contrary to Meyer's instructions.

7. The jury answered "Yes" to Special Verdict Interrogatory 12, which asked, "Did Meyer breach any express warranties that you may find to be contained in NSP performance specifications?"

8. The pertinent sections of the provision read:
   (1) Express warranties by the seller are created as follows:
   (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
   (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
   *Minn.Stat.* § 336.2–313(1)(a), (b) (1965).

9. Plaintiff's Exhibit # 27.

reasonably find, on the basis of these facts, that Meyer made an express warranty that the anchors would perform in accordance with NSP's technical specifications. The district court determined that "NSP relied on these specifications being fulfilled and Meyer sought to fulfill them." Civ. No. 4–80–280, Mem. op. at 7. We hold that the district court correctly denied Meyer's motion for a judgment as a matter of law on this point.

We cannot accept Meyer's argument that the technical specifications cannot be attributed to it as an express warranty because they were proposed by NSP. Meyer points out that Code section 2–313(2) refers to affirmations of fact or descriptions made by the seller, not by the buyer. This argument has a superficial appeal but it proves unpersuasive on these facts. While a buyer's specifications may not, without more, create an express warranty, where, as in this case, the specifications are adopted by the seller, incorporated into the contract, and form part of the basis of the bargain, the seller may not deny that a warranty arose purely because the buyer originally presented the specifications.

Meyer argues, in the alternative, that if an express warranty was created by the technical specifications, this warranty was subsumed within the express warranties of item 16. This is only a slightly modified phrasing of the argument disposed of above. Evidence was presented at trial to show that, while the warranties may overlap, the specifications cover product quality and design requirements which fall outside the general warranties of Item 16. Meyer presents no arguments to convince us that the district court erred in its determination that the warranty created by the specifications was not subsumed within the Item 16 warranties.

### B.

Having determined that a separate express warranty was created by the techni-

cal specifications, the district court found that the contractual disclaimers in Item 16 conflicted with this warranty. The court then applied Minn.Stat. § 336.2–316(1) to determine whether, and the extent to which, the disclaimers were effective.[10]

■ The district court found that the specifications were an important element of the anchor design and that NSP relied on their incorporation into the finished anchors. The court thus concluded that the specifications were "clearly a crucial part of the contract." *Northern States Power Co. v. ITT Meyer*, Civ. No. 4–80–280, Mem. op. at 7 (D.Minn. June 21, 1984). The court determined that the Item 16 disclaimer of all other warranties was inherently inconsistent with the specifications warranty and that these provisions could not reasonably be construed consistently. The court then held that the Item 16 disclaimers were inoperative. *See Wenner v. Gulf Oil Corp.*, 264 N.W.2d 374 (Minn.1978). We agree that the Item 16 disclaimer of all warranties directly and unavoidably conflicts with the specifications warranty. We therefore affirm the district court's conclusion.

Meyer argues, in the alternative, that the limitation of liability provision of Item 16 may be severed from the disclaimer provisions and applied to the specifications warranty without any inconsistency. While it does not automatically follow that the limitation of liability is invalid because the disclaimer was invalid, we cannot conclude that the district court erred in finding the disclaimer inapplicable in this case.

The district court carefully analyzed the terms of Item 16 and concluded that the limitation of remedy provision was inapplicable to the specifications warranty. After examining Item 16, we agree with the district court's interpretation of the scope of

---

**10.** Minn.Stat. § 336.2–316(1) (1965) provides:

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or extrinsic evidence (section 336.2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

the limitation. The lead sentence in the limiting clause speaks of breach of "this" warranty. Read with full regard to the context in which it appears, we believe that this clause specifically ties the proposed remedy to breach of a warranty created in Item 16.

Resort to a remedy is optional unless the remedy is expressly designated as exclusive. Minn.Stat. § 336.2–719(1)(b) (1965). *See Inland Products Corp. v. Donovan, Inc.*, 240 Minn. 365, 373–74, 62 N.W.2d 211, 219 (1953). Disclaimers are narrowly construed. We will not give effect to the limited remedy contained in Item 16 where this limited remedy was not expressly made applicable to the other warranties in the contract. We therefore affirm the district court's conclusion.

## III.

■ Other issues need not detain us long. Meyer's argument that NSP is not entitled to prejudgment interest is without merit. Minnesota law provides that interest is properly allowed from the date of the breach where the sum claimed as damages for breach of contract is liquidated or, if unliquidated, capable of being made certain by mathematical computation. *Potter v. Hartzell Propeller, Inc.*, 291 Minn. 513, 518, 189 N.W.2d 499, 504 (1971); *Spurck v. Civil Service Board*, 231 Minn. 183, 197, 42 N.W.2d 720, 728 (1950). NSP and Meyer stipulated to the cost of repairing the fallen towers. The sole determination that remained open for the jury, therefore, was each party's share of the liability. Minnesota law provides that when a sum certain is due, and that amount may be reduced by an unliquidated setoff, prejudgment interest is allowable on the balance. *Spurck*, 231 Minn. at 198, 42 N.W.2d at 728 (quoting *Knutson v. Lasher*, 219 Minn. 594, 606, 18 N.W.2d 688, 696 (1945)). The district court properly identified the fault allocated by the jury as an unliquidated setoff against Meyer's liability for repair costs. Thus, prejudgment interest properly was allowed. The authorities cited in

Meyer's brief do not support a contrary rule.

Our decision makes it unnecessary for us to consider NSP's argument that the limited remedy in Item 16 of the contract failed of its essential purpose.

Finally, we reject NSP's argument that the district court erroneously concluded that the costs of removing the defective anchors and reinstalling modified anchors were consequential damages subject to reduction for comparative fault. The property damage which NSP argues should be classified as direct damages appears to have been submitted to the jury as consequential damages. These were defined in part as property damages other than damages to the fallen towers. The parties apparently stipulated that the district court would decide as a matter of law how these damages are finally classified.

■ Minnesota law defines direct damages as "damages such as arise naturally in the usual course of things from the breach itself." *Despatch Oven Co. v. Rauenhorst*, 229 Minn. 436, 444–45, 40 N.W.2d 73, 79 (1949). Consequential damages are defined as damages which accrue as a consequence of the breach and which were within the parties' contemplation when the contract was made. *Id.* The question whether NSP's replacement and removal costs were direct or consequential damages is a close one. While we are not bound by a district court's interpretation of state law, *Kansas State Bank v. Citizens Bank*, 737 F.2d 1490, 1496 (8th Cir.1984) (en banc), we give great weight to decisions of experienced district court judges on state law questions. *Freeman v. Schmidt Real Estate & Ins., Inc.*, 755 F.2d 135, 137 (8th Cir.1985); *Melia v. Ford Motor Corp.*, 534 F.2d 795, 799 (8th Cir.1976). The district court concluded that these damages were consequential damages. This conclusion conforms with the standard established in *Despatch*. We do not find this conclusion to be in error.

For the foregoing reasons, we affirm the district court's judgment in all respects.