896 F.2d 1367
 15 Fed.R.Serv.3d 1232
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Roy JEFFCOAT; Carolina Homebuilders, Inc., Plaintiffs-Appellants,
v.
BLYTH EASTMAN PAINE WEBBER, INC., Defendant-Appellee.
ENERGY CONVERSION CORPORATION, Plaintiff-Appellant,
v.
BLYTH EASTMAN PAINE WEBBER, INC., Defendant-Appellee.
 Nos. 88-2084, 88-2671.
 United States Court of Appeals, Fourth Circuit.
 Argued: Nov. 2, 1989.
Decided: Feb. 8, 1990.
 
 Richard Mark Gergel (W. Allen Nickles, III, Cynthia Hall Ouzts, Gergel, Burnette, Nickles, Grant & Ouzts, P.A., on brief), for appellants.
 William Douglas Gray (Watkins, Vandiver, Kirven, Gable & Gray, on brief); Edwin Russell Jeter, Jr. (Charles Porter, T. Parkin Hunter, McNair Law Firm, P.A., on brief), for appellee.
 Before WIDENER and WILKINSON, Circuit Judges, and JOSEPH H. YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 This consolidated appeal arises from two suits brought against Blyth Eastman Paine Webber (BEPW) for allegedly failing to fulfill its agreement to underwrite the construction of an ethanol fuel plant. The first suit was brought by Energy Conversion Corporation (ECC), and the second by ECC's owner, Roy Jeffcoat, and another of his corporations, Carolina Homebuilders, Inc. (CHB). BEPW prevailed in both suits. Appellants ECC, Jeffcoat, and CHB contend that the district judge in the first suit erred in denying ECC's motion for joinder of additional plaintiffs, in granting BEPW's motion for directed verdict on ECC's fraud claim, and in granting BEPW's motion for judgment notwithstanding the verdict on ECC's contract claim, and that the district judge in the second suit erred in barring the suit under the doctrines of judicial estoppel, equitable estoppel, and res judicata. Finding no merit in any of these contentions, we affirm the judgments of the district courts.
 
 I.
 
 2
 Beginning in 1974, Roy Jeffcoat and CHB, a corporation owned and controlled by Jeffcoat, began investing time, effort, and financial resources toward development of an ethanol fuel plant. In 1980, Jeffcoat formed ECC specifically for development of an ethanol plant. He served as ECC's president.
 
 
 3
 In May 1980, ECC was awarded a $162,000 feasibility grant by the United States Department of Energy. Award of the grant was the first step toward eligibility for a 90% guaranteed government loan program for alternate fuel plants, though it in no way ensured ECC would be awarded a guaranteed loan.
 
 
 4
 BEPW was among a number of investment bankers which contacted Jeffcoat at this time about providing financing for his ethanol plant. BEPW first contacted Jeffcoat by a letter dated July 28, 1980. On August 6, 1980, it sent him a letter of intent setting forth a preliminary understanding between the parties regarding a proposed offering of securities to finance the project. In an economic analysis of the ECC project dated September 24, 1980, BEPW listed as a use for construction funds a "Developer's Risk Reimbursement Fee" of over three million dollars to be paid the general partner at closing from the equity contributions of the limited partners "for efforts expended in setting up the business and in managing the facility on behalf of the partnership." In another document with the heading "Compensation of the General Partner," BEPW lists an initial fee of $200,000 for the "performance of preformation feasibility, engineering, legal, financial and marketing studies." On November 18, 1980, BEPW was retained by ECC as investment banker for the project pursuant to an amended version of the letter of intent of August 6.
 
 
 5
 On August 22, 1981, ECC received a conditional commitment for a guaranteed government loan of $56 million for construction of the ethanol plant. The loan was contingent on several conditions, including requirements that a written commitment from the investment banker be submitted to the Department of Energy within 90 days and that evidence of $19.9 million in equity be submitted within 120 days.
 
 
 6
 BEPW allegedly had a number of problems with the loan guarantee. These problems included the structure of the loan guarantee which left 10% of the debt completely unguaranteed, the government's insistence on a first lien, and ECC's failure to have prepared the detailed cost estimates supported by a final engineering design which the government was going to require. A meeting was held between ECC, BEPW, and the Department of Energy on September 22, 1981, to discuss details of the deal.
 
 
 7
 After this meeting, the alcohol fuels group within BEPW met to discuss the feasibility of the ECC ethanol fuel project. Because of the changing political climate, the declining price for gasoline and ethanol, the rising price of corn (one of the primary ingredients of ethanol), the Department of Energy's stringent requirements, and doubts about the ability of the industry to operate profitably, BEPW decided not to go forward with its financing of the project. It contends that this decision cost it $750,000 in invested time and expenses, plus the loss of millions of dollars in anticipated fees. BEPW offers substantial evidence that its decision was correct in hindsight, as the ethanol fuels industry has lost a great deal of money in the ensuing years, a number of plants have been forced to close, and the continued viability of the industry is in doubt. According to BEPW, ECC had an incentive to go forward with the project despite its economic unsoundness in order to recover the developer's reimbursement fee; as underwriter for the project, however, BEPW had a responsibility to the investors whose funds would be used to pay the fee to question the soundness of the project.
 
 
 8
 There is some disagreement as to when BEPW informed ECC that it would not be financing the project. BEPW claims that it informed Jeffcoat by telephone on October 12, 1981. Jeffcoat maintains that he was not informed until late November, which left him no time to seek alternative financing before the Department of Energy loan commitment expired. However, ECC obtained several extensions of the commitment from the Department of Energy, extending until June 1984. Nonetheless, it was unable to arrange suitable financing, and the deal fell through.
 
 
 9
 ECC filed suit against BEPW in federal court in March 1983 alleging breach of contract. Jurisdiction was based on diversity of citizenship. BEPW filed its initial answer, and then on March 29, 1985, with the court's permission filed an amended answer asserting the additional defense of statute of frauds. In June 1985, four months before trial, ECC moved to amend its complaint to add Jeffcoat and CHB as plaintiffs. The district judge denied the motion. ECC also moved to add causes of action to allege estoppel, breach of fiduciary duty, and "unfair methods, acts or practices in the services to be rendered and false and misleading statements on material matters which are unlawful." ECC contends that the quoted allegation was one of fraud. The district judge did not explicitly rule on ECC's motion at that time.
 
 
 10
 At the conclusion of evidence at trial, BEPW moved for a directed verdict on the fraud claim. The district judge granted the motion. The jury was charged with breach of contract only, and it rejected ECC's claim for over $3 million based on the developer's reimbursement fee, but returned a verdict in ECC's favor for $200,000 based on the initial fee. BEPW moved for judgment notwithstanding the verdict based on the statute of frauds, which was granted by the court.
 
 
 11
 While the motion for judgment notwithstanding the verdict was pending, however, Jeffcoat and CHB filed a separate action against BEPW before a different federal district judge alleging breach of contract, fraud, breach of implied covenant of good faith and fair dealing, and estoppel. BEPW moved for summary judgment, and the district judge granted the motion based on principles of judicial estoppel, equitable estoppel, and res judicata. ECC, Jeffcoat, and CHB appeal from the judgments in their respective cases.
 
 II.
 
 12
 Appellants contend that the district judge in the first suit erred in denying ECC's motion to join Jeffcoat and CHB as additional plaintiffs. They contend that since BEPW failed to demonstrate that it would suffer any unfair prejudice from joinder of the additional parties, there was no justification for the district judge's refusal to allow joinder.
 
 
 13
 We disagree. "The provisions for permissive joinder under Rule 20 [of the Federal Rules of Civil Procedure] are very broad and the court is given discretion to decide the scope of the civil action and to make such orders as will prevent delay or prejudice." Arrington v. City of Fairfield, 414 F.2d 687, 693 (5th Cir.1969). The motion for joinder here was made over two years after initiation of the lawsuit and only four months before trial. The trial judge clearly did not abuse his discretion in ruling that the motion was untimely.
 
 
 14
 In addition, the district judge would have been justified in ruling that Jeffcoat and CHB were not real parties in interest to the dispute in this case. BEPW never entered into any contract with Jeffcoat or CHB, and those parties had no claims against BEPW. Furthermore, ECC suffered no prejudice from the trial court's decision not to allow joinder. No evidence or cause of action of ECC was excluded at trial because Jeffcoat and CHB were not present in the case.
 
 III.
 
 15
 Appellants next argue that the district court erred in directing a verdict in BEPW's favor on ECC's claim of fraud. They contend that ECC made clear to the court that it intended to allege fraud, and that the court therefore erred in ruling that ECC's complaint failed to state a claim of fraud. While ECC apparently did give some indication to the court that it intended to allege fraud, we nonetheless find that the grant of the directed verdict was proper because ECC failed to present any evidence of fraud or damages.
 
 
 16
 Appellants assert that BEPW fraudulently committed to a firm underwriting of the ECC ethanol fuel plant. They also maintain that BEPW made false representations regarding its knowledge, experience, and commitment to ethanol fuel projects. ECC failed to present evidence to support these claims, however. The letter on which appellants rely as evidence of an underwriting agreement was merely a letter of intent which, as the trial judge instructed the jury, "is rarely more than an agreement to agree and is, therefore, unenforceable." There is no evidence that BEPW committed itself to a firm underwriting of the ECC ethanol plant. ECC cannot plausibly argue that it reasonably believed that BEPW was entering into a firm commitment to underwrite $73 million in debt and equity in a high risk venture when numerous details concerning the project had not been resolved and the proposed closing date for the project was a year or more away. Similarly, any representations made by BEPW concerning its experience and knowledge were merely part of its sales pitch, and plainly do not rise to the level of a fraudulent misrepresentation.
 
 
 17
 In addition, the district judge's grant of the directed verdict was justified on the ground that ECC's purported fraud claim was actually a cause of action for breach of contract. Under South Carolina law, a plaintiff cannot simply convert a contract cause of action into a tort cause of action, but rather is limited to the rights for which the parties bargained. See Seebaldt v. First Federal Sav. & Loan Ass'n, 239 S.E.2d 726, 727 (S.C.1977). Here, the parties never agreed to a firm underwriting of the ethanol project. Nor does there exist any type of duty arising out of the investment banker-client relationship which might provide the basis for a tort cause of action. See Troutman v. Facetglas, Inc., 316 S.E.2d 424, 426 (S.C.App.1984).
 
 
 18
 Furthermore, even if BEPW had made fraudulent representations to ECC, we are skeptical that ECC suffered any damages. Any reliance expenses suffered by ECC were likely covered by the $162,000 feasibility grant it received from the Department of Energy. In addition, ECC had more than ample opportunity to secure another investment banker for its project after BEPW withdrew but before the Department of Energy loan commitment expired. Its failure to do so indicates that the project simply was not feasible in light of the changing political and economic climate. ECC was not damaged by any behavior of BEPW, but rather by changing conditions beyond the control of either party.
 
 IV.
 
 19
 Appellants also assert that the district court erred in granting BEPW's motion for judgment notwithstanding the verdict on ECC's breach of contract claim based on the $200,000 initial fee provision. We disagree.
 
 
 20
 First, there was no evidence to support a finding of a contract for an initial fee for reimbursement for preparation of preformation studies. Appellants point to no testimony by Jeffcoat that he ever reached an oral agreement with BEPW to reimburse ECC $200,000 for expenses for preformation studies. The only time Jeffcoat mentioned that figure was in reading from an in-house report prepared by BEPW that he did not have access to at the time of negotiations. Nor is there any evidence of a written contract. The only document produced at trial which mentioned a $200,000 initial fee was by its own terms clearly a draft document which only discussed the proposed terms of financing. Again, this was an in-house document to which Jeffcoat did not have access.
 
 
 21
 Second, as we have discussed above, there is no indication that ECC suffered any damages. ECC was reimbursed for all expenses it incurred in connection with preformation studies by the Department of Energy grant.
 
 V.
 
 22
 Finally, appellants argue that the trial judge in the second suit erred in ruling that the suit was barred under the doctrines of judicial estoppel, equitable estoppel, and res judicata. We disagree and hold that each of these grounds was an appropriate basis for dismissal of the suit.
 
 
 23
 Appellants assert that BEPW promised Jeffcoat in his personal capacity the $3 million developer's reimbursement fee. They argue that the statement in the contract that the fee was to be paid to the "general partner" intended that Jeffcoat personally be the recipient of the fee and not ECC. This claim is belied, however, by Jeffcoat's testimony during trial in the first suit that ECC was the general partner. The doctrines of judicial and equitable estoppel act to prevent Jeffcoat from altering his testimony in order to prevail in the second suit. According to the doctrine of judicial estoppel, "a party may properly be precluded as a matter of law from adopting a legal position in conflict with one earlier taken in the same or related litigation." Allen v. Zurich Ins. Co., 667 F.2d 1162, 1166 (4th Cir.1982). Similarly, the doctrine of equitable estoppel acts "to preclude a party from contradicting testimony or pleadings successfully maintained in a prior judicial proceeding." Konstantinidis v. Chen, 626 F.2d 933, 937 (D.C.Cir.1980). We think each of these doctrines prevents Jeffcoat from asserting that he has a separate cause of action against BEPW for the developer's reimbursement fee.
 
 
 24
 Similarly, Jeffcoat and CHB are precluded from bringing any other causes of action against BEPW arising out of the alleged underwriting agreement by the doctrine of res judicata. Appellants do not, and indeed could not, contest that both Jeffcoat and CHB were in privity with ECC. Instead, they argue that the district judge in the first suit expressly reserved the right of Jeffcoat and CHB to bring a separate cause of action and that BEPW acquiesced in the splitting of the causes of action. We do not read any statement of the trial judge in the first suit to rise to the level of a determination that judgment in the first suit would be without prejudice to Jeffcoat and CHB. Nor did BEPW in any way acquiesce to Jeffcoat and CHB being allowed to maintain a second suit. As these exceptions to the doctrine of res judicata are inapposite, we hold that the doctrine was correctly applied to bar suit by Jeffcoat and CHB. See First Nat. Bank of Greenville v. United States Fidelity & Guaranty Co., 35 S.E.2d 47, 57 (S.C.1945). Furthermore, Jeffcoat and CHB were at most third party beneficiaries of the ECC-BEPW contract, and therefore could have no greater right to recover on the contract than ECC, which lost at trial. See Kingman v. Nationwide Mutual Ins. Co., 134 S.E.2d 217, 221 (S.C.1964). Nor is there any evidence to support a claim of tortious interference with contract against BEPW for procuring breach of alleged contracts between Jeffcoat and CHB with ECC. If such breaches did indeed occur, they were merely incidental to the termination of the contract between ECC and BEPW.
 
 VI.
 
 25
 For the foregoing reasons, the judgments of the district courts are
 
 
 26
 AFFIRMED.