**UNITED STATES of America, for the use of Laura M. CONROY, d/b/a "Burney" the Burner, Plaintiff,**

v.

**SOUTHERN CONTRACTING OF CHARLESTON, INC. and Fireman's Fund Insurance Company, Defendants.**

Civ. A. No. 2:93–2495–18.

United States District Court,
D. South Carolina,
Charleston Division.

Sept. 1, 1994.

Henry P. Wall, Jill R. Quattlebaum, Columbia, SC, for plaintiff.

B. Michael Brackett, Columbia, SC, for defendant.

### ORDER

NORTON, District Judge.

This matter is before the court on Plaintiff's Motion for Summary Judgment.

### I. BACKGROUND

On September 24, 1991, the Air Force awarded Defendant Southern Contracting of Charleston, Inc. (SoCon) a contract to replace an existing incinerator at the Charleston Air Force Base. SoCon contracted with Plaintiff Laura M. Conroy for the construction and installation of a new incinerator, which was known as "Burney" the Burner. Defendant Fireman's Fund Insurance Company served as a surety for SoCon on the project.

Taking the facts in the light most favorable to SoCon (the nonmoving party), Conroy caused delays in the incinerator project from the outset. For example, the intended completion date for the project was March 16, 1992; however, Conroy did not begin manufacture of Burney until May 18, 1992, two months beyond the original completion date. The subcontract required Conroy to design and submit blueprints that would comply with Air Force plans and specifications, but the Air Force rejected Conroy's submittals on three occasions.

As a consequence of these delays, SoCon was unable to complete its contract on time. The Air Force assessed liquidated damages against SoCon, and SoCon incurred substantial overhead expenses and consequential damages due to these delays.

Upon delivery of Burney on August 10, 1992, SoCon discovered several defects. The specifications called for the incinerator to be painted with heat resistant paint, but Burney was shipped to the site with only a coat of primer on it. Burney's refractory was defective. Upon attempting to assemble Burney, SoCon discovered the pieces would not fit together properly due to irregularities in the refractory between Burney's primary and secondary chambers. SoCon notified Plaintiff's representative at the site, Tyler Troupe, of this problem. With Conroy's consent, SoCon retained a technician to grind down the refractory so Burney could be assembled.

The subcontract required Conroy to provide a "field service technician" to be on site "in an advisory capacity to ensure proper operation of the system during testing. . . . Failure to have an incinerator manufacturer's field service technician on site during performance testing will void the performance guarantee." Specifications for Project BKFX91–1087. The parties' interpretation of the duties of the field service technician under this provision varied. The field ser-

vice technician himself testified that he was required to do nothing at the project site and was there mainly to pick up the check for the final payment owed to Conroy by SoCon.

SoCon encountered problems regarding Burney's electronic control box. The computer logic for the electronic control system for the computer was flawed, preventing Burney from operating properly in automatic mode. SoCon's president, an electrical engineer, substantially revised and edited the computer logic for Conroy's program to make the automatic mode function properly.

Due to these problems, SoCon, in lieu of sending final payment to Conroy, sent an invoice which listed SoCon's damages that flowed from Conroy's alleged breach of contract. These damages included the costs for extended overhead; liquidated damages assessed by the Government; and the cost of labor and materials incurred in making Burney operate properly in conformity with government specifications. The net result was a balance due to SoCon in excess of $65,000.

On September 22, 1993, Conroy filed suit against SoCon seeking payment of the balance of the subcontract price ($29,150.84). SoCon asserted as defenses that Conroy had materially breached the subcontract and failed to perform a condition precedent. SoCon also counterclaimed for breach of contract and breach of warranty.

Plaintiff now seeks summary judgment on its cause of action for payment of the contract price and on SoCon's causes of action for breach of contract and breach of warranty.

## II. ANALYSIS

■ To grant a motion for summary judgment, this court must find "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In evaluating a motion for summary judgment, this court must view the record in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–23 (4th Cir.1990). The judge is not to weigh the evidence himself but rather to determine if there is a genuine issue for trial.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

### A. Applicability of Article 2 of the Uniform Commercial Code

As a preliminary matter, this court must address the applicability of Article 2 of the UCC, as codified in Title 36 of the South Carolina Code, to this transaction. SoCon claims Article 2 is not applicable, because this transaction involves a mix of goods and services and the "services required of Plaintiff were far greater than incidental to Plaintiff's performance under the contract." Def.'s Mem.Opp'n Summ.J. at 11. Conroy contends that the transaction is primarily for the sale of a good.

■ This court agrees that this transportation involves a hybrid contract, calling for the delivery of goods and the provision of services. However, it may nevertheless be a "contract for the sale of goods" within the scope of § 36–2–201(1). In considering whether a hybrid contract is one "for the sale of goods" under the UCC, courts generally employ the "predominant thrust" or "predominant factor" test. *See Ranger Constr. Co. v. Dixie Floor Co.,* 433 F.Supp. 442 (D.S.C.1977). Under this test, courts evaluate transactions to determine if "their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)." *Bonebrake v. Cox,* 499 F.2d 951, 960 (8th Cir.1974).

While it is true that Conroy was required to design blueprints, submit plans to the Air Force for approval, obtain Department of Health and Environmental Control approval, and perform various other steps before manufacturing and delivering the incinerator, these services were not the primary thrust of the contract. The primary purpose is evidenced in an August 5, 1991 proposal sent by Conroy to SoCon stating: "Please consider our quote *to supply 'Burney'* the Burner Incinerator in compliance with data sheets titled 'Construction Specifications': $93,-

325.00. Plumbing and electrical lines and hook up are to be performed by others and not included in this quotation." (Emphasis added.) The contract itself is labeled a "Purchase Order," and the terms provide for the bulk of the contract price to be paid upon "delivery of equipment."

The Fourth Circuit applied Article 2 to a similar transaction in *Kline Iron and Steel Co. v. Gray Communications Consultants, Inc.*, 715 F.Supp. 135 (4th Cir.1989). There, the contract was for the construction of a television tower. The court held that services such as engineering, design, fabrication and inspection, while crucial, should be characterized as part of the cost of the good. The court also said the language of the proposal, which used the term "Buyer," indicated a sale of a good.

SoCon attempts to distinguish this case from *Kline* by arguing that a government contract by its very nature involves more services than an ordinary contract. In support of this contention, SoCon presses the importance of the complex submittal and approval process in which a manufacturer must engage with various governmental agencies. SoCon contends that because failure to meet government specifications would prevent delivery of the good, the services must be considered an integral part of a government contract.

This court agrees that services, particularly in a government contract such as Conroy's, are an integral part of the manufacture and delivery of a good. Nevertheless, this court concludes that the predominant thrust of this contract is the provision of the incinerator, and therefore this contract is one for the sale of goods subject to the requirements of Article 2.

### B. Plaintiff's Claims

■ Plaintiff seeks summary judgment on its cause of action for payment of the contract price. All parties agree that SoCon accepted the incinerator, as acceptance is defined under S.C.Code Ann. § 36–2–606. Conroy argues that, because SoCon accepted the incinerator, it is obligated to pay Conroy at the contract rate. According to S.C.Code Ann. § 36–2–607(1), a "buyer must pay at the contract rate for any goods accepted." However, § 36–2–717 allows a buyer, upon notifying the seller of his intention to do so, to deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract. While the buyer must give notice of this intention to withhold payment, the notice need not be formal and any language which reasonably indicates the buyer's reason for holding up his payment is sufficient. S.C.Code Ann. § 36–2–717 off. cmt.

Here, in August of 1992, Conroy authorized SoCon to work on Burney's problems and deduct the cost of the work from the balance due on Burney upon start-up. (Facsimile from Conroy to SoCon of 8/11/92.)[1] Further, instead of tendering the remainder of the contract price when it was due, SoCon sent an invoice listing SoCon's damages from Conroy's alleged breach of contract, including the extended overhead, liquidated damages, and labor and material costs incurred in making Burney operate properly. The net result was a balance due to SoCon in excess of $65,000.

The facsimile, the sending of the invoice, and the withholding of payment were sufficient to notify Conroy of SoCon's intention to deduct damages from the price due. Therefore, Plaintiff's Motion for Summary Judgment must be denied as to Plaintiff's cause of action.

### C. Defendant's Counterclaims

Conroy also seeks summary judgment on SoCon's counterclaims. SoCon seeks damages for the losses it sustained as a result of Conroy's alleged breaches of contract and warranty. Whether SoCon is able to pursue these counterclaims depends on whether SoCon notified Conroy of any breach in accor-

---

1. In a letter to the court, Plaintiff objects to the use of this facsimile, which Defendant submitted after oral argument on the motion. Apparently, Defendant inadvertently omitted this document from its Memorandum in Opposition to Plain-

tiff's Motion for Summary Judgment. Because this court should decide dispositive motions based on a consideration of the facts as they truly are, the Plaintiff's objection to Defendant's submission of this facsimile is overruled.

dance with S.C.Code Ann. § 36–2–607(3)(a), which provides: "Where a tender has been accepted ... the buyer must within a reasonable time after he discover or should have discovered any breach notify the seller of breach or be barred from any remedy...." Unsurprisingly, SoCon claims it sufficiently notified Conroy, and Conroy claims she was not adequately notified.

SoCon claims it sufficiently notified Conroy because one of Conroy's employees was present in Charleston to witness the problems with Burney and SoCon's inability to use Burney prior to having the problems fixed. SoCon also notes that, during the delay in receiving the incinerator, it notified Conroy by letter that time was of the essence and that it faced liquidated damages.

Conroy claims she was not notified in accordance with § 36–2–607(3)(a), because she had no notice that SoCon considered her legally in breach and she thought her employees had resolved all of the problems.

 Section 36–2–607(3)(a) does not prescribe any form for the required notification. Courts have thus developed their own guidelines for determining what constitutes adequate notice. Some courts have held that virtually any complaint about the transaction will satisfy the requirement. *E.g. Northern States Power Co. v. ITT Meyer Indus.*, 777 F.2d 405 (8th Cir.1985); *Boeing Airplane Co. v. O'Malley*, 329 F.2d 585 (8th Cir.1964). Under this "lenient standard of notification," the buyer must merely let the seller know that the transaction is troublesome. Other courts require the buyer to notify the seller that the buyer considers the seller to be legally in breach. *E.g. Eastern Air Lines v. McDonnell Douglas Corp.*, 532 F.2d 957 (5th Cir.1976). The standard adopted by these courts is known as the "strict standard of notification." SoCon and Conroy agree that South Carolina courts have not chosen between the lenient and strict notification standards, though the existence of both standards was recognized and explained in *Southeastern Steel Company v. W.A. Hunt Constr. Co.*, 301 S.C. 140, 390 S.E.2d 475 (Ct.App.1990) (buyer gave inadequate notice of breach under either standard; therefore, court did not choose between standards).

For numerous reasons, this court finds the lenient standard to be the better option. First, the Official Comment to S.C.Code Ann. § 36–2–607 provides:

The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2–605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

Although some courts have interpreted the last sentence of this comment to require that the notification specify *a breach*, this court interprets the comment as a whole to indicate exactly the opposite—that virtually any notification that fairly apprises the seller of the problems will suffice. Indeed, some UCC commentators have said "the drafters intended a loose test; a scribbled note on a bit of toilet paper will do." James J. White and Robert S. Summers, Uniform Commercial Code 425 (2d ed. 1980).

As a policy matter, the lenient standard discourages the use of litigation to settle commercial disputes. Requiring a buyer to use the magic word "breach" does not encourage settlement with a seller who is attempting to cure defects. In fact, it does little more than force buyers to retain lawyers in an effort to preserve their rights and force sellers to hire lawyers as a defensive maneuver.

Additionally, the lenient standard promotes flexibility in commercial practice, which is one of the goals of the UCC. It is consistent with § 36–1–106, which provides that the "remedies provided by this act shall be liberally administered to the end that the

aggrieved party may be put in as good a position as if the other party had fully performed." The lenient standard also allows parties to conduct transactions with the pragmatic concept of "commercial good faith" as their guide. Whether a buyer acted with commercial good faith should be the focus of the case by case analysis required to assess adequacy of notification. *See Northern States Power Co. v. ITT Meyer Indus.*, 777 F.2d 405, 409 (8th Cir.1985); *see also LaFayette Stabilizer Repair, Inc. v. Machinery Wholesale Corp.*, 750 F.2d 1290, 1294 (5th Cir.1985) (determination of whether notice complies with the legal requirement depends on the reasonableness of the buyer's efforts to communicate dissatisfaction); *Kopper Glo Fuel, Inc. v. Island Lake Coal Co.*, 436 F.Supp. 91, 96 (E.D.Tenn.1977) (notice analysis must be conducted with attention overall to questions of commercial good faith).

Finally, there is substantial precedent for liberally interpreting the notification requirement. The Eighth Circuit Court of Appeals applied the lenient standard in *Boeing Airplane Co. v. O'Malley*, 329 F.2d 585 (8th Cir.1964). There, as summarized by White and Summers,

> the buyer purchased a helicopter which was delivered on December 1, 1959. The seller did not receive formal notice of dissatisfaction until February, 1961. The court held that certain events well prior to February, 1961 were sufficient to constitute notice to the seller. The first of these was the failure of the helicopter to function properly in the presence of one of the seller's experts. After the demonstration, but before February, 1961, the buyer had informed the seller that the buyer was closing down operations because of inadequacies in the helicopter and was moving the helicopter elsewhere in order to take care of it.

White & Summers, Uniform Commercial Code 426. Another case illustrating the lenient standard is *Oregon Lumber Co. v. Dwyer Overseas Timber Prods. Co.*, 280 Or. 437, 571 P.2d 884 (1977). There, the buyer bought timber of a particular grade from the seller. On several occasions, the buyer informed the seller that the lumber was below grade. However, the buyer continued to accept the timber and made several payments before refusing to pay the balance due under the contract. The court ruled that the early complaints of the buyer met the notification requirement of § 2–607(3)(a). The court held that notification "may be given in any manner or form sufficient to appraise the seller that there are problems with the transaction." 571 P.2d at 887. The court further held that when a buyer notifies a seller of a problem with a transaction, the buyer need not assert the "intention to make a claim for damages or pursue any other remedy." *Id.; see also Southern Illinois Stone Co. v. Universal Engineering Corp.*, 592 F.2d 446, 452 (8th Cir.1979) (parties working together for several months provided the kind of notice which opens the way for normal settlement through negotiation and therefore satisfied § 2–607(3)).

In light of the aforementioned policies and cases, it seems clear that any good faith communication that reasonably notifies the seller that the buyer is troubled by the transaction should suffice to preserve the buyer's right to pursue UCC remedies in the event it suffers damages from the defect.

The seller here actually knew of the defects and the problems those defects were causing the buyer, as in *Boeing* and *Oregon Lumber*. SoCon notified Conroy early in the transaction that the delays were troublesome and that the incinerator was not functioning properly.

Where more than one inference may be drawn from undisputed facts, or where the facts are disputed, the sufficiency of notice of a breach of contract or warranty is a question properly submitted to the jury. *Northern States Power Co. v. ITT Meyer Indus.*, 777 F.2d 405 (8th Cir.1985). Applying the lenient standard to the facts of this case, and viewing the facts in the light most favorable to SoCon, this court cannot say as a matter of law that SoCon did not sufficiently notify Conroy under § 36–2–607(3)(a). Therefore, Conroy's Motion for Summary Judgment on SoCon's counterclaims must be denied.

### III. CONCLUSION

For the above reasons, it is therefore

ORDERED that Plaintiff's Motion for Summary Judgment be **DENIED.**

**AND IT IS SO ORDERED.**