**TRIDENT CONSTRUCTION COMPANY, INC.,**
**Plaintiff,**

v.

**The AUSTIN COMPANY, Defendant.**

**No. CIV.A. 2:02–0702–18.**

United States District Court,
D. South Carolina,
Charleston Division.

July 16, 2003.

Andrew K. Epting, Jr., Sean K. Trundy, Charleston, SC, for Plaintiff.

William G. Lyles, III, Charleston, SC, Keith Leon Baker, McLean, VA, for Defendant.

## MEMORANDUM OPINION AND ORDER

NORTON, District Judge.

This matter is before the court on the defendant's motion for summary judgment pursuant to Rule 59 of the Federal Rules of Civil Procedure.[1] For the reasons set forth below, defendant's motion is granted.

### I. Background [2]

The Austin Company ("Austin") is a global company that designs and con-

---

1. Austin filed a motion for judgment on the pleadings, or in the alternative, a motion for summary judgment. This court will treat the motion as a motion for summary judgment because both parties have presented evidence to the court. See Fed.R.Civ.P. 12(c).

2. The following facts are based on evidence before the court, drawing all reasonable inferences in favor of Trident, the non-moving party.

structs industrial facilities. (Lockwood Depo. at 11–12.) Trident Construction Company, Inc. ("Trident") is a construction contractor in Charleston. In 1999, Austin identified a notice published by the Naval Facilities Engineering Command ("the Navy") in the Commerce Business Daily notifying potential contractors that the Navy intended to solicit proposals for the design and construction of a Corrosion Control Facility (i.e. an airplane hangar) to be built at the Charleston Air Force Base. (Niksch Aff. ¶ 3.) On June 11, 1999, the Navy issued Solicitation N62467–98–R–1049 requesting proposals to supply the Corrosion Control Facility. (Niksch Aff. ¶ 6.)

Austin had been the general contractor for a similar project at Tinker Air Force Base in Oklahoma in 1998. (Niksch Aff. ¶ 4.) In the Tinker A.F.B. project, Austin contracted with American Buildings Company ("American") to supply the steel hangar.[3] (Lockwood Depo. at 15.) It contracted separately with Ranger Erectors to perform the erection services. (Lockwood Depo. at 15.) Because of this previous experience, Austin contacted American about the possibility of its submitting a proposal to Austin to supply and erect the hangar for the Corrosion Control Facility. (Niksch Aff. ¶ 5; Breitenback Aff. ¶ 6.) Rather than using separate subcontractors as it had in the Tinker A.F.B. project, Austin was seeking a single sub-contractor whose duties would consist of "furnishing the steel and cladding, and then erecting the steel and applying the cladding." (Niksch Depo. at 10.) American informed Austin that if the proposal included the erection of the hangar, Austin should contact a local dealer .... (Niksch Aff. ¶ 5.)

American then contacted Trident[4] to ask whether it was interested in submitting a proposal to Austin to supply and erect the hangar. (Fairey Depo. at 13–14.) Trident sent a letter to Austin dated October 19, 1999, providing information about Trident and its qualifications for the job. (D's Ex. 3.) The letter, written by Robert Fairey, President of Trident, to Bill Niksch, General Manager of the Austin's Southwest District Office, stated that "[w]e understand you are seeking a qualified erector/subcontractor to provide the steel package for the C–17 Corrosion Hangar proposed to be built at the Charleston Air Force Base." (D's Ex. 3.)

Fairey traveled to Houston on October 27, 1999, and toured American's Heavy Fabrication Division. On that trip, Fairey attended a meeting on October 28, 1999, at Austin's offices in Houston with representatives of American and Austin. Trident alleges that an agreement was forged at this meeting whereby Austin, Trident, and American agreed to work together exclusively as a team to pursue the Corrosion Control Facility project in Charleston against other teams competing for the project. (Fairey Depo. at 16.) Fairey testified that Austin agreed that if it received the prime contract from the Navy, Trident would receive the subcontract, subject to receiving certain information on Trident's qualifications. (Fairey Depo. at 24.) "The agreement was that if the Austin Company w[ere] successful in getting a contract, then we would also be given a contract to complete the erection and fabrication." (Fairey Depo. at 23.) Under this alleged agreement, Trident was to be the subcontractor and American was to be the material supplier. (Fairey Depo. at 26.) From

---

3. The steel hangar consists of the structural steel and the "cladding" (i.e. the metal roof panels and metal wall panels). Unless otherwise indicated, this opinion refers to these components collectively as the "hangar."

4. Trident had been a dealer for American for over twenty years.

January to April 2000, Austin, Trident, and American engaged in a series of communications in which Trident submitted several proposals and Austin requested various changes and deductions. (D's Ex. 9.)

On June 13, 2000, Austin was awarded the prime contract for the Corrosion Control Facility, under which the Navy agreed to pay a total price of $18,117,000.00. (Pl's Ex. 8.) This was the figure in Austin's price estimate prepared on May 1, 2000. (Pl's Ex. 9.) Also included in Austin's price estimate was Trident's proposal to supply and erect the hangar for $5.2 million less deductions. (Pl's Ex. 9 at 8.) Thus, in submitting its bid to the Navy for the prime contract, Austin presumably used Trident's proposal as its cost estimate for supplying and erecting the hangar. (Niksch Depo. at 24–25.) Austin did not seek a cost estimate from anyone else before submitting its bid to the Navy. (Lockwood Depo. at 82–83.) Although Austin used Trident's cost estimate in submitting its bid to the Navy, it intended all along to put the subcontract for the supply and erection of the hangar up for competitive bidding with the hope of paying less than the $5.2 million proposed by Trident. (Niksch Depo. at 29.)

After Austin was awarded the prime contract, it continued to negotiate with Trident and sent Trident a proposed written contract on September 25, 2000. (Pl's Ex. 13; Fairey Depo. at 140, 142.) At the same time, Austin also began soliciting other bids for the erection of the hangar. On September 22, 2000, Austin issued a bid solicitation for bids to be submitted by October 27, 2000. (Pl's Ex. 14.) Trident contends that it did not know about Austin's solicitation of other

bids for the subcontract. Fairey testified that in September or October 2000, when he heard rumors that Austin was soliciting other bids, he called Bill Lockwood, an executive at Austin, who "denied that and confirmed that we were still a team. We were still the deal. They were just working through some final negotiations with the [Navy]." (Fairey Depo. at 45, 146.) [5] On November 9, 2000, Fairey wrote a letter to Lockwood apologizing for questioning Lockwood about the rumors and telling him "[t]hanks for your reassurance; we are glad to be part of your team." (Pl's Ex. 21.) Austin did not respond to this letter. After receiving several bids, Austin signed a lump-sum subcontract with Hightower Construction Co. on December 12, 2000, to supply and erect the hangar. (Pl's Ex. 20.)

Trident filed this action in state court alleging four causes of action: (1) breach of contract; (2) promissory estoppel; (3) breach of contract accompanied by a fraudulent act; (4) unjust enrichment. Austin removed the case to this court and filed this motion for summary judgment.

## II. Summary Judgment Standard

Summary judgment shall be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for

---

**5.** Although Fairey stated in his deposition that Lockwood told him that "we wouldn't do that to you, you'd sue us," when asked whether he recalled Lockwood saying those words exactly, Fairey admitted that "I recall him saying

we wouldn't do that to you, you would—and I may have filled in the rest of it, because I was pretty hot when I called him that day." (Fairey Depo. at 146.)

trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There is no requirement that the trial judge make findings of fact. *Id.* at 250, 106 S.Ct. 2505. Rather, the threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* In other words, "to grant summary judgment the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Const., Inc.,* 915 F.2d 121, 124 (4th Cir.1990). An issue of fact concerns material facts only if establishment of the fact might affect the outcome of the lawsuit under governing substantive law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. All facts and reasonable inferences therefrom are viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(c)). Once this burden has been met, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting Fed.R.Civ.P. 56(e)); *see also Pleasurecraft Marine Engine Co. v. Thermo Power Corp.,* 272 F.3d 654, 658 (4th Cir.2001).

## III. Legal Analysis

### A. Breach of Contract

■ The issue is whether an enforceable contract was formed between Austin and Trident. Trident does not allege that it had a formal written contract with Austin. (Fairey Depo. at 44.) Rather, Trident alleges that it entered into an oral contract with Austin.

#### 1. Statute of Frauds

South Carolina has enacted the Uniform Commercial Code's ("UCC") provision that "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." S.C.Code Ann. § 36–2–201(1) (West 2003) (hereinafter "Statute of Frauds").

##### a. The Alleged Oral Contract Was "For the Sale of Goods."

The parties dispute whether the alleged oral contract between Austin and Trident was "for the sale of goods" and therefore subject to the Statute of Frauds. If the alleged oral contract was for the sale of services rather than goods, then the Statute of Frauds would not prohibit its enforcement.

■ The UCC definition of "goods" is very broad. *Kline Iron and Steel Co. v. Gray Communications Consultants, Inc.,* 715 F.Supp. 135, 138 (D.S.C.1989) (internal citation omitted). " 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Title 36, Chapter 8) and things in action." S.C.Code

Ann. § 36–2–105(1) (West 2003). In considering whether a transaction that provides for both goods and services is a contract for the sale of goods governed by the UCC, courts generally employ the predominant factor test. *Plantation Shutter Co., Inc. v. Ezell*, 328 S.C. 475, 492 S.E.2d 404, 406 (1997) (internal citation omitted). "Under this test, courts evaluate transactions to determine if their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)." *U.S. v. Southern Contracting of Charleston, Inc.*, 862 F.Supp. 107, 109 (D.S.C.1994) (internal citation and quotation marks omitted). "[I]f the predominant factor of the transaction is the rendition of a service with goods incidentally involved, the UCC is not applicable." *Plantation Shutter*, 492 S.E.2d at 406. "If, however, the contract's predominant factor is the sale of goods with labor incidentally involved, the UCC applies." *Id.* "In most cases in which the contract calls for a combination of services with the sale of goods, courts have applied the UCC." *Id.*

Trident's alleged contract with Austin was a "lump-sum" hybrid contract for the provision of "[t]he design, fabrication, and erection" of the hangar for the Corrosion Control Facility. (Fairey Depo. at 25.) In *Kline,* the court held that a hybrid contract for sale and erection of a television tower was "for the sale of goods" under the UCC. 715 F.Supp. at 138–40. The court explained that "the only 'services' to be provided under the contract are the erection of the tower and ... the listed insurance premiums" and that "these services are merely incidental to the sale of the tower." *Id.* at 139. Similarly, in this case, although Trident's alleged contract with Austin includes the erection of the hangar, the erection services are incidental to the sale of the steel and cladding for the hangar. Thus, the predominant thrust of this alleged agreement was for the sale of the steel and cladding for the hangar. *See also Southern Contracting,* 862 F.Supp. at 109–10 (holding that the predominant factor in an agreement for the construction and installation of an incinerator at the Charleston Air Force Base was "for the sale of goods" and therefore governed by the UCC.)

Trident argues that its alleged contract with Austin is distinguishable from these cases because the duties under the contract are divisible between American's supply of the steel and cladding and Trident's erection services. Trident argues that "this was a construction contract where Austin was the design/build contractor, American was supplying the steel, and Trident agreed to do the erection (heavy lifting)." (Pl's Opp. Mem. at 12.) Although Trident may be correct that it intended to purchase the steel and cladding from American, Trident's alleged contract with Austin was a lump-sum contract to "furnish and erect" the hangar. (Jan. 7, 2000 letter from Fairey to Lockwood, Pl's Ex. 5). Trident alleges that it contracted directly with Austin, and American was to serve as Trident's materials supplier. Trident does not contend that American had a separate contract with Austin. Thus, even if Trident subcontracted with American for the supply of the hangar, the alleged contract between Trident and Austin was for the *sale and erection* of the hangar.

Trident cites *In re Breast Implant Prod. Liability Litig.,* 331 S.C. 540, 503 S.E.2d 445 (1998), in which the South Carolina Supreme Court held that health care providers who provided breast implants were providing services, not products, and therefore were not "sellers" of goods under the UCC. First, the court held that

health care providers were not subject to strict liability under South Carolina law because they were "in the business" of providing services and were not "in the business" of selling breast implants. *Id.* at 448–51.[6] Second, the court explained that health care providers were not subject to a breach of warranty claim under the UCC because its conclusion "that health care providers offer services, not products—determines our holding as to the issues of warranty under Article II of the U.C.C." *Id.* at 452. "The [UCC] warranty provisions do not govern contracts which are purely for services." *Id.*

Trident argues that *In re Breast Implant* is applicable because it involved a situation where one party contracted with another party to provide a service, with a third party providing the underlying materials. That is, Trident argues that just as health care providers offer the service of installing breast implants manufactured by a third party, it was to provide the service of erecting a hangar manufactured by American. Accordingly, Trident argues that it was not "in the business" of selling hangars. However, unlike the health care providers who installed the breast implants, Trident was "in the business" of selling hangars. Trident has served for many years as a dealer for American, a manufacturer of pre-fabricated buildings including steel hangars. Although Trident does not manufacture hangars itself, it does sell them. As explained earlier, Trident alleges that it entered into a contract for the sale and erection of the hangar. Thus, unlike health care providers, who are "in the business" of providing health care services that sometimes includes the provision of health care products, Trident was "in the business" of selling *and* erecting steel hangars.

In sum, Trident's alleged contract with Austin was a hybrid contract, with the predominant thrust being the provision of a good—the steel hangar to be used in the Corrosion Control Facility. Thus, the alleged contract was "for the sale of goods" and is subject to the Statute of Frauds.

## 2. None of the Exceptions to the Statute of Frauds Apply.

■ The Statute of Frauds contains several exceptions, none of which are applicable in this case. First, the Statute of Frauds does not apply "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted." S.C.Code Ann. § 36–2–201(3)(b). Trident argues that Austin has admitted the existence of a contract between Trident and American because Mr. Niksch testified that he called Mr. Breitenbach of American to inform him that "the United States Government had notified The Austin Company that it would receive award of a contract *for the project that included the building to be supplied by American Buildings Company.*" (Niksch Aff. ¶ 11; Breitenbach Aff. ¶ 14.) (emphasis added.) This isolated phrase is perhaps evidence that Austin may have had an agreement with American for American to supply the steel for the hangar. However, the statement does not even mention Trident. As Trident points out, because Trident and American were working together to build the steel structure, it also could be inferred from this statement that Austin had an agreement with Trident. However, earlier in the same affidavit, Niksch uncategorically denies any contract with Trident. (Niksch

---

**6.** The South Carolina strict liability statute provides that one must be "in the business" to be held strictly liable. S.C.Code § 15–73–10 (West 2003).

Aff. ¶ 10.) Thus, this phrase does not serve as an admission by Austin that it entered into a contract with Trident.

■ Second, the Statute of Frauds does not apply "if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement." S.C.Code Ann. § 36–2–201(3)(a) (West 2003). Trident argues that it "made commitments for the design and orchestrated the order of steel from American." (Pl's. Opp. Mem. at 14.) However, Trident has not alleged and there is no evidence that Trident or American had begun to manufacture the steel hangar or that Trident had made any commitment for the procurement of a specially manufactured steel hangar. Thus, this exception does not apply.

■ Third, "if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents," the writing requirement of the Statute of Frauds is satisfied against the receiving party "unless written notice of objection to its contents is given within ten days after it is received." S.C.Code Ann. § 36–2–201(2) (West 2003). This exception "is designed to take some of the sting out of the rule which would expose a businessman who sends a letter of confirmation after a telephone agreement to liability on the agreement but who would be precluded from enforcement against the other par-

ty." S.C. Reporter's Notes to § 36–2–201(2) (West 2003). Trident contends that Fairey's letter of November 9, 2000, is written confirmation that Trident had a contract with Austin, and it satisfies the Statute of Frauds because Austin did not reject this letter in writing within ten days. (Pls.' Opp. Mem. Ex. 21). However, this letter does not meet the exception for two reasons. First, the letter is not a "writing in confirmation of the contract and sufficient against the sender" because it does not mention any contract and only says that Trident "was glad to be a part of your team." (Pl's Ex. 21.) This letter alone would not be sufficient to hold Trident liable and therefore Austin cannot be held liable for failing to respond. Second, the letter was not sent "within a reasonable time" after the alleged oral contract. The letter was sent on November 9, 2000, the day after Fairey contacted Lockwood to ask about rumors that Austin was "shopping around" for another subcontractor. Yet Trident alleges that it entered into the alleged oral contract with Austin almost a year earlier on October 28, 1999, at the meeting in Houston. The letter therefore was not sent within a reasonable time after the formation of the contract. Thus, the exception in S.C.Code Ann. § 36–2–201(2) does not apply.

■ Finally, the Statute of Frauds does not apply if "there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." S.C.Code Ann. § 36–2–201(1).[7] Although Trident references several documents that it alleges are a "writ-

7. This is not really an exception to the Statute of Frauds, but rather is its basic rule that a contract for the sale of goods in excess of $500 must be in writing. Trident treats this provision as an "exception" to the Statute of Frauds because it admits that it never had a formal written contract and therefore attempts to rely on other "writings" to satisfy the Statute of Frauds.

ing sufficient to indicate a written contract for sale," none of these documents are signed by Austin, its agent, or broker. (Pl's.Opp.Mem.Exs.6, 7, 9, 11, 13, 21, 28.) The proposal letters written from Trident to Austin were not signed by Austin and cannot bind Austin as having entered into a written contract. (Pl's Opp. Mem. Exs. 6, 7, 11.) Austin's schedule of costs that it submitted to the Navy that included Trident's proposed costs of $5.2 million (less deductions) also did not have any signature by Austin. (Pl's Opp. Mem. Ex 9.) [8] The standard draft contract that Austin sent to Trident obviously cannot be written contract because it was not signed by either party. (Pl's Opp. Mem. Ex 13.) The alleged confirmation letter dated November 9, 2000, from Fairey to Lockwood addressed in the previous section was not signed by Austin. (Pl's Opp. Mem. Ex 21.) Finally, American's specifications that it sent to Trident were not signed by Austin. (Pl's Opp. Mem. Ex 28.) Although all these documents may cumulatively be used as evidence that there was an oral agreement between Trident and Austin, they do not constitute a "writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." S.C.Code Ann. § 36–2–201(1).

### 2. There Was No Oral Contract Between Austin and Trident.

■ Even if the Statute of Frauds did not require a written contract in this case, Trident has not presented sufficient evidence upon which a reasonable jury could conclude that the parties entered into an enforceable oral contract. "A contract is an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct."

*Roberts v. Gaskins*, 327 S.C. 478, 486 S.E.2d 771, 773 (1997) (citing *Gaskins v. Blue Cross–Blue Shield of S.C.*, 271 S.C. 101, 245 S.E.2d 598 (1978)). "The necessary elements of a contract are an offer, acceptance, and valuable consideration." *Sauner v. Public Service Authority of South Carolina*, 354 S.C. 397, 581 S.E.2d 161, 166 (2003).

■ Viewing the evidence in the light most favorable to Trident, Austin and Trident agreed that Austin would award Trident the subcontract if Austin were awarded the prime contract. However, in general, "agreements to agree do not amount to a contract in South Carolina." *Blanton Enterprises, Inc. v. Burger King Corp.*, 680 F.Supp. 753, 770 n. 20 (D.S.C. 1988); (internal citations omitted); *see also Jeffcoat v. Blyth Eastman Paine Webber, Inc.*, 896 F.2d 1367, 1990 WL 15556 (4th Cir.1990) (UNPUBLISHED TABLE DECISION) (holding that the alleged oral contract was not enforceable because there was no evidence that defendant committed itself to a firm undertaking and numerous details of the project had not been resolved). Here, Trident admits that Austin never agreed to accept any particular proposal submitted by Trident. Mr. Fairey testified as follows:

Q: Subsequent to the initial meeting with the Austin Company, the Trident Company or Trident submitted a series of proposals to the Austin Company?

A: Yes.

Q: Were any of those proposals ever accepted by the Austin Company?

---

**8.** This submission of costs also is not a "writing sufficient to indicate that a contract for sale has been made between the parties." S.C.Code Ann. § 36–2–201(1). Using Trident's cost estimate in its submission does not bind Austin to use Trident as its subcontractor.

A: I have no written acceptance of them, nor verbal acceptance. No, not that I can recall.

(Fairey Depo., D's Mem. Ex. 4 at 61.) Thus, although Austin may have promised that it would enter into a contract with Trident at some point, Austin and Trident never agreed on any specific proposal.

■ Moreover, the terms of the alleged agreement were too indefinite to form a binding contract. For example, Trident and Austin never agreed on a price for the alleged subcontract. Under South Carolina law, "[c]ertain terms, such as price, time and place, are considered indispensable and must be set out with reasonable certainty. Where a contract does not fix a definite price, there must be a definite method for ascertaining it." *McPeters v. Yeargin Const. Co.*, 290 S.C. 327, 350 S.E.2d 208, 211 (1986). The court in *Southern Fire & Cas. Co. v. Teal*, 287 F.Supp. 617, 621–622 (D.S.C.1968), explained:

> If the contract is silent on price, for instance, the agreement is not indefinite if a formula or method for ascertaining the price is understood and agreed upon. Nor will a contract fail for indefiniteness when the gaps that the parties have left may be implied from custom and usual forms and former course of dealing. Moreover, the subsequent action of the parties, such particularly as the acceptance of the "gaps" as expressed by the other party, may give the required definiteness to the agreement and establish sufficiently the intention of the parties. Generally speaking, it is only when the "gaps" are intended to be the subjects of future negotiations and the intention of the parties is that a completed contract shall await the completion of such negotiations that the contract will fail for indefiniteness; otherwise, the Courts will apply the rule of custom and reason in filling in the "gaps."

Here, there is no evidence to show that Trident and Austin intended to enter into a binding contract with the price as a "gap" to be filled in at a later point according to the usual custom and practice. Rather, the evidence, including the letters from Trident to Austin, indicates that there would be no binding agreement until they agreed upon a price. Trident and Austin continued to negotiate the price, even after Austin had been awarded the prime contract. Trident cites *AROK Constr. Co. v. Indian Constr. Serv.*, 174 Ariz. 291, 848 P.2d 870, 878 (1993) for the proposition that the oral agreement was not "too indefinite." However, in that case the parties agreed upon a price and the scope of the work. *Id.* Thus, Austin and Trident did not form an oral contract in this case because a binding contract was contingent upon an agreement on a price, among other items.

## B. Breach of Contract Accompanied by Fraudulent Act

■ In order to have a claim for breach of contract accompanied by a fraudulent act, the plaintiff must establish three elements: (1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach. *Conner v. City of Forest Acres*, 348 S.C. 454, 560 S.E.2d 606, 612 (2002) (citing *Harper v. Ethridge*, 290 S.C. 112, 348 S.E.2d 374 (1986)). This cause of action fails because there was no enforceable contract and therefore no breach of contract.

## C. Promissory Estoppel

■ The elements of promissory estoppel are: (1) the presence of a promise unambiguous in its terms; (2) reasonable reliance upon the promise by the party to whom the promise is made; (3) the reliance is expected and foreseeable by the

party who makes the promise; and (4) the party to whom the promise is made must sustain injury in reliance on the promise. *Woods v. State,* 314 S.C. 501, 431 S.E.2d 260, 263 (1993).

First, Austin argues that the doctrine of promissory estoppel cannot be used to circumvent the writing requirements of the Statute of Frauds. In *McDabco, Inc. v. Chet Adams Co.,* 548 F.Supp. 456, 460 (D.S.C.1982), the district court held that "promissory estoppel cannot be used to overcome the statute of frauds in a case which involves the sale of goods." However, in *Collins Music Co., Inc. v. Cook,* the South Carolina Court of Appeals explained that "in a proper case, the doctrine of estoppel may be invoked to prevent a party from asserting the statute of frauds." 281 S.C. 580, 316 S.E.2d 418, 420 (1984) (citing *Florence Printing Co. v. Parnell,* 178 S.C. 119, 182 S.E. 313 (1935)) (holding that defendant was not estopped from asserting statute of frauds because plaintiff could not show detrimental reliance on defendant's alleged oral promise). Similarly, in *Atlantic Wholesale Co., Inc. v. Solondz,* 283 S.C. 36, 320 S.E.2d 720, 723–24 (1984), the South Carolina Court of Appeals held that the defendant was estopped from asserting a Statute of Frauds defense to an oral contract to buy 300 ounces of silver where the plaintiff relied to its detriment upon the defendant's oral promises. Thus, under certain circumstances, a defendant can be estopped from relying on the Statute of Frauds to prohibit the enforcement of an oral contract. *See Blanton Enterprises,* 680 F.Supp. at 774 n. 23 (noting that the South Carolina Court of Appeals has "adopted promissory estoppel as an exception to ... [the] Statute of Frauds" and had "apparently rejected" the *McDabco* decision).

 However, these cases have made its clear that "[b]efore the estoppel doctrine can be invoked ... there must be competent proof of the existence of the oral contract." *Atlantic Wholesale,* 283 S.C. 36, 320 S.E.2d 720, 723 (1984) (internal citations and quotation marks omitted). In other words, although the doctrine of promissory estoppel may be used to avoid the Statute of Frauds' writing requirement, it may not be used to create a legally enforceable promise when it would not otherwise be binding under ordinary contract principles. As the court in *Blanton Enterprises* aptly explained:

> [W]here, as here, the facts and circumstances of a case demonstrate that the parties to an alleged oral promise did not intend to be bound until they had reduced the promise to writing and this never occurred, one party cannot recover on that promise under a promissory estoppel theory. To hold otherwise would undermine the universally recognized contract principle that the parties to a promise may control the time at which it becomes obligatory.

680 F.Supp. 753, 775. For the reasons explained above, the evidence does not support a finding that Trident and Austin entered into a binding oral contract in this case. Therefore, Trident cannot hold Austin liable under the doctrine of promissory estoppel because there was no oral contract.

### D. Unjust Enrichment

 Trident's "unjust enrichment" cause of action appears to be a claim based on the equitable theory of *quantum meruit.* Absent an express contract, recovery under *quantum meruit* is based on a quasi-contract theory, the elements of which are: "(1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by the defendant of the benefit under conditions that make it unjust for him to retain it without paying its value." *Myrtle Beach Hosp., Inc. v. City of Myrtle*

**578**

*Beach,* 341 S.C. 1, 532 S.E.2d 868, 872 (2000) (citing *Columbia Wholesale Co., Inc. v. Scudder May N.V.,* 312 S.C. 259, 440 S.E.2d 129, 130 (1994)). Trident argues that Austin obtained a benefit from Trident's submission of its proposal and therefore was unjustly enriched. However, when a subcontractor submits a proposal to a general contractor, the general contractor is not unjustly enriched when it does not award the subcontract to that subcontractor even though it the general contractor may have benefitted from the subcontractor's bid. Trident admits that it is a common practice for general contractors to use the price submitted by a subcontractor when establishing the general contractor's bid. (Fairey Depo. at 58.) In such cases, general contractors are not liable for reimbursing prospective subcontractors with whom it elects not to contract. Similarly, Austin used Trident's bid in making its proposal to the Navy. Equity does not require that Austin repay Trident for this benefit because it chose to use another subcontractor. This is not a situation where Austin has retained a benefit bestowed upon it by Trident that makes it unjust for it to retain the benefit without paying for its value.[9]

---

**9.** Trident also argues that Austin engaged in an unethical practice of "bid shopping" or "bid chiseling." However, Trident has not cited any legal authority that would support a recovery on such a theory. First, in *Preload Tech. Inc. v. A.B. & J. Constr. Co., Inc.,* 696 F.2d 1080, 1089 (5th Cir.1983), the court explained that if a general contractor shops around for another subcontractor after using a subcontractor's bid to obtain the prime contract, the general contractor is estopped from enforcing the original subcontractor's bid. However, this case is inapposite because it involves the reverse of this case: the general contractor was seeking to enforce the subcontractor's promise. Austin is not seeking to enforce any agreement upon Trident.

## IV. Conclusion

For the reasons stated above,

It is therefore, **ORDERED** that Austin's Motion For Summary Judgment be **GRANTED.**

**AND IT IS SO ORDERED.**

Second, in *Cullum Elec. & Mech., Inc. v. Mech. Contractors Ass'n of South Carolina,* 436 F.Supp. 418, 421 n. 2 (D.S.C.1976), the court issued the following dicta in a footnote: The sub-bidding procedure may at times be plagued by other unethical practices such as "bid shopping," in which generals submit their own bids and thereafter "shop" for a mechanical or other subcontractor who will meet a given price, and "bid piracy" in which a subcontractor will use the valuable information contained in a competitor's already-filed bid as a starting point for the preparation of his own bid. Whether this practice is "unethical" is subject to reasonable debate. In any event, this court did not set forth any legal theory for liability based on this "unethical" practice.